**EUROPAK, INC., Appellant,**

v.

**COUNTY OF HUNT and the State of Texas, Appellees.**

No. 18262.

Court of Civil Appeals of Texas, Dallas.

Feb. 14, 1974.

R. Jack Ayres, Jr., Atwell, Cain, Davenport & Jones, Dallas, for appellant.

Jerry Spencer Davis, County Atty., Hunt County, Greenville, John L. Hill, Atty. Gen., Bernard D. Newsom, Jr., Asst. Atty. Gen., Austin, for appellee.

GUITTARD, Justice.

This controversy arises under the Texas Clean Air Act, Tex.Rev.Civ.Stat.Ann. art. 4477–5 (Vernon Supp.1973). On application of Hunt County and the State of Texas the trial court granted a temporary injunction restraining defendant Europak, Inc., from constructing a horse-slaughtering and packing plant without having obtained from the Texas Air Control Board a permit as required by § 3.-27(a) of the Act. Europak appeals on the ground that the evidence fails to establish that a permit is required for the particular facility proposed. We agree with the trial court's ruling that such a permit is required.

### The statute

The Texas Clean Air Act is a comprehensive measure for controlling and abating air pollution and emission of air contaminants. Section 1.05 provides that the Texas Air Control Board is "the principal authority in the state on matters relating to the quality of the air resources in the state and for setting standards, criteria, levels and emission limits for air content and pollution control." The Board is expected to develop expertise in this field, since its nine members must include a professional engineer, an agricultural engineer, a licensed physician, and an industrial manager (§ 2.02), and it is authorized to employ professional consultants and technical assistants and establish such laboratory and other facilities as may be required to carry out the provisions of the Act. (§ 2.-09.) The Board is directed to "establish the level of quality to be maintained in, and shall control the quality of, the air resources in this state," and to that end is directed to "prepare and develop a general, comprehensive plan for the proper control of the air resources of the state." (§§ 3.01, 3.02.) It is empowered to make rules and regulations consistent with the general intent and purposes of the Act (§ 3.09), and may grant variances beyond the limitations prescribed in the Act or in its rules and regulations when it finds upon adequate proof that compliance will result in arbitrary and unreasonable taking of property or in the practical closing and elimination of any lawful business, occupation or activity without sufficient corresponding benefit or advantage. (§ 3.21.)

The problem in this case concerns possible odors from Europak's projected horse-

slaughtering plant. Section 1.03(1) of the Act defines "air contaminant" as meaning "particulate matter, dust, fumes, gas, mist, smoke, vapor or *odor*, or any combination thereof *produced by processes other than natural.*" (Emphasis added.) Europak's commencement of construction without a permit is alleged to be in violation of § 3.-27(a), as follows:

> Any person who plans to construct any new facility or to engage in the modification of any existing facility which *may emit air contaminants into the air* of this State shall apply for and obtain a construction permit from the board before any actual work is begun on the facility. The board may exempt certain facilities or types of facilities from the requirements of Section 3.27 and Section 3.28 if it is found upon investigation that such facilities or types of facilities will not make a significant contribution of air contaminants to the atmosphere. (Emphasis added.)

The action of the Board in granting or denying such a permit is governed by subdivisions (b) and (c) of § 3.27:

> (b) Along with the application for the permit, the person shall submit copies of all plans and specifications necessary for determining whether the proposed construction will comply with applicable air control standards and the intent of the Texas Clean Air Act, together with any other information which the board considers necessary.

> (c) If, from the information submitted under subsection (b) of this section, the board finds no indication that the proposed facility will contravene the intent of the Texas Clean Air Act, including proper consideration of land use, the board shall grant within a reasonable time a permit to construct or modify the facility. If the board finds that the emissions from the proposed facility will contravene these standards or will contravene the intent of the Texas Clean Air Act, it shall not grant the permit

and shall set out in a report to the applicant its specific objections to the submitted plans of the proposed facility.

The present proceeding was brought under § 3.27(f), which authorizes the Board to seek an injunction to halt work on a facility which is being constructed without a permit issued under § 3.27.

### *The meaning of "may"*

Our question is whether the evidence at the temporary injunction hearing supports a finding by the judge that the projected horse-slaughtering plant "may emit air contaminants into the air" so as to require a permit under § 3.27(a). This question requires interpretation of the auxiliary verb "may." Europak argues that "may" cannot be interpreted as indicating a mere possibility because any proposed use of land "may" in that sense emit some substance into the air, and such a definition would render the statute unconstitutional, since it would allow the state to limit the use of private property by arbitrary or capricious means, contrary to Tex.Const. art. I, § 17, which forbids taking or damaging of private property for public use without adequate compensation. Consequently, Europak argues, § 3.27(a) should be construed to require the agency asserting a violation "to establish in reasonable environmental probability that the facility allegedly in violation *will* emit" contaminants as defined in the Act.

We cannot accept this interpretation. Consideration of the Act as a whole convinces us that "may" is used in its usual sense to indicate possibility rather than probability. *See* Fisher v. Coastal Transport Co., 149 Tex. 224, 230 S.W.2d 522 (1950). A similar problem of statutory interpretation was presented in United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). In that case the Supreme Court of the United States construed an act providing that food should be deemed to be adul-

terated "if it contains any added poisonous or other added deleterious ingredient which may render such article injurious to health." The Court said:

It is not required that the article of food containing added poisonous or other added deleterious ingredients must affect the public health and it is not incumbent upon the government in order to make out a case to establish that fact. The act has placed upon the government the burden of establishing, in order to secure a verdict of condemnation under this statute, that the added poisonous or deleterious substances must be such as may render such article injurious to health. The word "may" is here used in its ordinary and usual signification, there being nothing to show the intention of Congress to affix to it any other meaning. . . . [I]t is intended that if any flour, because of any added poisonous or other deleterious ingredient, may possibly injure the health of any of these, it shall come within the ban of the statute.

A pure-food law using similar language was interpreted in Lewiston Milling Co., Ltd. v. Cardiff, 266 F. 753 (9th Cir. 1920), as follows:

If we should interpolate the word "possibly" in the context of the law, making it read "may possibly" render such article injurious to health, we would only express what the word "may" implies by its common significance, and what every person of common intelligence must be presumed to know and understand, and we must presume that the jury did so understand its meaning, when given to them in the plain language of the court. Furthermore, the significance of the word "may" or "might" is not to be taken as including every conceivable possibility, but must be reasonably applied, having in mind the purpose of the statute and the injury or possible wrong which it was designed to prevent.

In our opinion "may" is used in the same sense in the Texas Clean Air Act. In order to construe that Act in the light of its purpose and the wrong it was designed to prevent, we look to the legislature's statement of purpose in § 1.02, as follows:

It is the policy of this state and the purpose of this Act to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of health, general welfare, and physical property of the people, including the esthetic enjoyment of the air resources by the people and the maintenance of adequate visibility.

In accordance with this purpose and policy, we cannot interpret § 3.27(a) as requiring a construction permit for a proposed facility only when there is a "reasonable probability" that air contaminants "will" be emitted. Neither do we interpret it as requiring such a permit whenever there is any conceivable possibility of such emission. Rather, we conclude from the context that a permit is required whenever there is a practical possibility so as to justify the Board in making an investigation. The Act contemplates that the Board will develop expertise in the field of air pollution and charges it with responsibility to establish air control standards for the state and to determine when such standards have been violated. Whenever a projected facility "*may* emit air contaminants into the air," under subdivision (a) of § 3.27, that is, when there is a practical possibility of such emission so as to justify an investigation, a construction permit is required so that the Board may examine the application with plans of the proposed facility attached, together with such other information as the Board may require, and determine under subdivisions (b) and (c) "whether the proposed construction *will* comply with applicable air control standards and the intent of the Texas Clean Air Act." The contrasting uses of "may" and "will" in these subdivisions indicate a deliberate distinction between possibilities and probabilities. If the Board finds that the proposed construction "will" comply, it

must grant the permit, but if it finds that the facility "will contravene these standards or will contravene the intent of the Texas Clean Air Act," it must deny the permit and specify its objections in a written report to the applicant. Section 6.01 provides for judicial review of the Board's decision. These provisions show that the purpose of requiring the permit is to enable the Board to investigate any practical possibility of emission of air contaminants from proposed new facility and make a determination of whether such a possible emission will probably contravene the applicable standards before the issue is presented in court.

■ Europak's construction of the Act would drastically limit the Board's investigative and adjudicative functions. If, on application for an injunction under § 3.-27(f), the issue before the court is whether the facility "probably will" emit contaminants, the Board is denied the opportunity to review the plans of the proposed facility before the "probably will" determination is made, and the court, rather than the Board, becomes the tribunal for determining in the first instance whether the proposed facility presents a danger of pollution. In our view, the intent of the Act is to constitute the Board as the authoritative agency of the state to examine plans for the proposed facility and make the initial decision. Whether the facility "will" probably emit contaminants is a matter for the Board to consider in determining whether the facility will comply with the applicable standards. It is not a proper issue for the court in deciding whether a permit is required.

■ We find no substance in Europak's contention that this construction would render the Act unconstitutional. The Act does not give the Board unlimited discretion. Under § 3.27(c) it is authorized to deny a permit only when it finds that the proposed facility "will" contravene applicable standards or the intent of the Act. If it denies a permit, the applicant

has recourse to the courts under § 6.01 to establish that the denial was invalid, arbitrary or unreasonable. Whether such a denial in this case would be invalid, arbitrary or unreasonable under the evidence was not the issue before the trial court, and is not the controlling question here. We cannot presume in advance that the Board's action on an application for a construction permit will be invalid, arbitrary or unreasonable. Even if the Board should act in such a manner, Europak would have an adequate remedy by judicial review under § 6.01. Consequently, no constitutional problem is presented.

### Evidence concerning emission of contaminants

■ In view of our interpretation of "may" as indicating a practical possibility justifying investigation, we hold that the evidence at the temporary injunction hearing supports a finding by the trial judge that the projected horse-slaughtering plant "may emit air contaminants into the air" so as to require a permit under § 3.27(a). Although there was much testimony concerning the methods Europak proposed to use to control the emission of odors, the trial court was justified in concluding that the proposed plant presented a practical possibility that odors would be emitted. Europak's plans as described by its president and the architects and engineers who designed the plant project a facility for slaughtering and packing two hundred horses a day within a short distance of the city limits of Greenville. They testified that the building in which the slaughtering and packing would be done would be constructed of air-tight panels and would be under negative pressure so that any flow of air through doors and other openings would be into the building rather than out of it. Ventilation would be provided by an exhaust system using charcoal filters to prevent odors from escaping. The nonedible parts of the animals, including blood, hides and intestines, which otherwise would cause odors after a short time on

the premises, would be kept in a cooled area in the building and would be removed daily in refrigerated trucks. Outside the building would be holding pens one hundred twelve feet wide and one hundred fifty feet long with a capacity of three hundred horses. The pens would have roofs and concrete floors, but would be open to the flow of air like other stock pens. When the horses are moved out of each pen, the manure would be removed, deposited in containers, and sprinkled with chemicals, and the pen would then be swept and hosed down with water. Approximately twelve hundred pounds of manure a day would be produced when the pens are occupied to capacity. Water used to wash the pens and urine from the horses in the pens would pass into drains and then through an interceptor to remove solid material from the liquid before reaching the sewer.

The principal witness who testified concerning control of odors from the plant was Dr. J. Martin Hughes, a professor of environmental engineering at Texas A & M University and a member of a professional engineering firm. He was first contacted for Europak by Europak's counsel after service of the temporary restraining order on Europak and only four days before the hearing on the application for temporary injunction. Dr. Hughes testified that he had been retained by Europak to develop odor-control facilities for the projected horse-slaughtering plant. He had examined Europak's construction plans and could readily see modifications that would lead to improvements. At the time of the hearing he was in the process of formulating recommendations. Among the recommendations he proposed were devices to create negative pressure within the building, use of closed containers to keep the residue materials, and "very stringent" cleanup and sanitation practices. Such measures, he said, were essential because in the past some plants had become relatively lax and the decay of the materials could become quite odor-producing. He testified that by using his recommended methods the odor emission could be minimized. Also, he was in the process of preparing plans and specifications concerning ventilation of the building involving use of activated carbon to remove odors from the exhaust air. For this purpose he had recommended the use of charcoal filters, which, he said, were commercially available, but had not been applied to this particular type of plant. He said that complete elimination of odor from the plant could not be projected, but there was a "possibility" with the negative air pressure and closed building to "virtually eliminate" odors from escaping from the interior of the plant. He was not personally acquainted with any facility in which such controls had been employed.

With respect to control of odors in places where manure was deposited, Dr. Hughes recommended putting the material in closed containers and using a spray of diluted potassium permanganate, a recognized chemical for controlling manure odor by oxidation. This procedure, he said, would be the best possible method, since it was the limit of available technology, but he did not know of any other meat-packing plant using it. On cross-examination Dr. Hughes was not willing to say that twelve hundred pounds of horse manure a day would not produce an odor. He did not recommend spraying the pens when they were occuried by horses. He proposed that as the horses are continually moved through the pens, each pen should be sprayed when not occupied. He recognized that the odor from horse manure was a "well-known factor," but he would qualify that factor according to location and how far one might be from the source. He expressed the opinion, based on what he had read in published technical journals, that use of the recommended oxidizing chemical and prompt manure removal would reduce the odors to nonobjectionable levels for residents in the surrounding area.

■ Thus Europak's own evidence shows that operation of the projected plant

will be accompanied by a high concentration of potentially odor-producing materials, both in the plant and in the pens, which will be practically certain to emit odors in substantial quantities unless extraordinary control measures are adopted. Europak's description of the proposed odor-control measures emphasizes rather than minimizes the potential for odor emission. The testimony of Dr. Hughes does not establish that emission of odors will be eliminated, either from the building or from the pens. He would say only that if his recommendations are followed the odors would be reduced to "nonobjectionable levels." Since his recommendations were not complete at the time of the hearing, the record does not establish that they would be economically feasible, and Europak was not bound to adopt them. In determining the extent to which they were likely to be implemented, the trial judge could consider the circumstance of Dr. Hughes' employment by counsel after the temporary restraining order was served. Under this evidence the judge did not abuse his discretion in issuing the temporary injunction.

### The exclusion of "natural processes"

■ Europak also contends that the evidence in this case establishes that no permit is required because there is no evidence that contaminants may be emitted from the building where the slaughtering and packing will take place, and that any odor emitted from the pens cannot be considered because it will be produced by "natural" processes excluded from regulation by § 1.03(1), which defines "air contaminant" as odors, etc., "produced by processes other than natural." We reject this contention on two grounds.

First, for reasons already discussed, we hold that the trial court would have been justified in finding that contaminants may be emitted from the building as well as the pens. The evidence shows that "very

stringent" cleanup and sanitation practices and untested air filtration devices will be required to control the odors from potentially odor-producing material in the building, and even then odors from that source may not completely be eliminated. The adequacy of these odor-controlling methods is a matter for the Board to pass on in determining whether a permit should be granted rather than one for the court to pass on in determining whether a permit is required.

Second, we hold that the trial court was justified in concluding that the odor from the pens was "produced by processes other than natural" within § 1.03(1). "Natural" is a word of many meanings. In Webster's New International Dictionary 1630 (2d ed. 1934), the definition of "natural" contains fifteen numbered paragraphs, of which the following are pertinent here:

> Not artificial; in a state of nature, or produced by nature; as *natural* heat or color; a *natural* jewel; not abnormal; realizing the characteristic type; as, an imperfect crystal lacks its *natural* development . . . .

> In accordance with or due to the conditions, events, or circumstances of the case; in line with normal experience; as, a father is the *natural* protector of his children.

This definition indicates two separate but related concepts: (1) that which occurs in nature, as distinguished from that which is brought about by man's devices, and (2) that which occurs in the course of normal experience, as distinguished from the abnormal or unusual. Europak stresses the first concept and insists that odors produced by the alimentary processes of animals are "natural" because they occur in nature, no matter to what extent they are controlled, concentrated or compounded by human activity. Plaintiffs emphasize the second concept and argue that a concentration of three hundred horses near a residential and commercial area is not in the ordinary course of things.

Our study of the Act persuades us that the legislative intent is not confined to either of these concepts, but must be construed as embracing both. The broad interpretation of "natural processes" urged by Europak would be wholly inconsistent with the intent of the Act to protect the air resources of the state from odors and other contaminants. Among the most objectionable and persistent odors known to civilized society are those produced by processes which are "natural" in this broad sense. The decay of dead animal matter is a process no less "natural" than the alimentary functions of live animals. On the other hand, the expression "processes other than natural" cannot reasonably be construed as excluding all processes involving human activity. If odors resulting from the concentration of as many as three hundred horses into a small area are not "natural" because of the intervention of human devices, then little, if any meaning is left for the statutory limitation of "contaminants" to those "produced by processes other than natural." Even without this limiting language the Act cannot be reasonably interpreted as applying to odors produced by "natural processes" in the sense of processes occurring wholly apart from human intervention. We cannot suppose that this limiting language was intended to avoid the implication that the Act might apply to contaminants produced by wildlife. The legislature must have intended this limitation to have some practical effect. Thus the concept of a process which occurs in nature apart from human devices is not in itself a satisfactory interpretation of the legislative intent.

Neither do we think that the legislative intent is confined to the concept of that which occurs in the course of normal experience. The gathering of livestock into pens cannot be said to be abnormal or unusual in Texas, and, although the number of animals involved here seems relatively large, we see no basis for a purely numerical criterion. If we interpret "natural" in a relative sense to mean normal or usual in the particular area, then other sources of serious pollution, such as industrial plants in highly industrialized areas, may be considered normal or usual. If such activities were held to be excluded from the Act, its purposes would be largely frustrated.

We conclude that the only interpretation which gives the words "produced by processes other than natural" any meaning consistent with the other provisions of the Act is to apply both the basic concepts expressed in the definition above quoted. In other words, a "natural process" is one that occurs in nature and is affected or controlled by human devices only to an extent normal and usual for the particular area involved. All other contaminants are "produced by processes other than natural" within the meaning of the Act. Accordingly, in this case we hold that the trial court was justified in concluding that the odor from the pens as well as from the building would be "produced by processes other than natural," since although the process which directly produces the odor may be one that occurs in nature, the evidence is sufficient to support a finding that concentration of such a large number of animals into such a small area would not be normal or usual in this vicinity. Therefore, the trial court correctly held that § 3.27(a) of the Act forbids construction of such a facility without a permit.

For the reasons given, we hold that the trial judge did not abuse his discretion in granting the temporary injunction.

Affirmed.