**STATE of Texas, Appellant,**

v.

**F/R CATTLE COMPANY, INC., Appellee.**

**No. 11–91–201–CV.**

Court of Appeals of Texas, Eastland.

April 2, 1992.

Rehearing Denied April 30, 1992.

Suzanne Latting, Ken Cross, Atty. General's Office, Environmental Protection Div., Austin, for appellant.

John Turney, Benckenstein Oxford & Johnson, Austin, Robert J. Glasgow, Robert J. Glasgow Law Offices, Stephenville, for appellee.

## OPINION

McCLOUD, Chief Justice.

This case involves the interpretation of language contained in the Texas Clean Air Act. TEX. HEALTH & SAFETY CODE ANN. §§ 382.001–382.141 (Vernon Pamph. 1992). The State of Texas, on behalf of the Texas Air Control Board,[1] filed suit against the defendant, F/R Cattle Company, Inc., alleging that, because of odors emanating from the defendant's calf feeding facility, the defendant was violating the Clean Air Act. The trial court concluded that the Board had no jurisdiction under the Clean Air Act and dismissed the State's petition. We reverse and remand.

The defendant commenced the operation of the calf feeding facility in July of 1990 in Erath County. There are several dairies, as well as several country residences, in the area. Calves are "by-products" of dairy operations. The defendant picks up, on a daily basis, baby calves from dairies in the area. The calves are fed and maintained at the defendant's facility for approximately 110 to 120 days. Some of the calves are custom fed for the area dairymen, and others are sold to feed lots. Calves arrive and leave the facility daily. When the one-day-old calves first arrive, they are placed in wooden "hutches"[2] where they remain for about 60 days. They are then placed in small weaning pens. The hutches are eight feet by five feet. Each hutch houses three baby calves. There were about 1,500 hutches at the calf feeding facility. At the time of trial, the defendant was feeding approximately 6,000 calves.

The Board received numerous complaints regarding the odor associated with the defendant's operation. There was considerable evidence that the odor from manure produced by calves is different from the odor of manure produced by mature cattle. The odor emitting from the calf facility was described as "putrid," "sour," "rancid", and like an "open sewer pit." There was evidence that the foul odor came from the hutches housing the calves. Richard Edward Robey, the defendant's vice-president and facility manager, testified that the smell was similar to the smell of the dairies in the area. Dwight Pittman, a consulting engineer employed by the defendant, testified that the amount of manure produced by 6,000 calves would be equivalent to the amount of manure produced by 475 dairy cows. Pittman testified that the odor associated with the defendant's facility was similar to the odor resulting from a normal dairy operation.

Mary Martin, who lived about one-half mile from the facility, described the stench as "rotten." Martin testified that, in her janitorial service, she cleans a building where dairy cattle are sold. The witness stated that the smell from the calf operation was different from the smell she en-

---

1. The Board is granted the power and duty to administer the Clean Air Act and is directed to accomplish the purposes of the Act through the control of air contaminants by all practical and economically feasible methods. Section 382.-011.

2. Jesse J. Macias, Jr., an engineering specialist with the Board, described the "hutches" as "cage-like."

counters while cleaning the dairy cattle facility. David Whitenton stated that 18 years ago he and his wife built their country retirement home in the area where the defendant's facility is now located. After the defendant commenced the calf feeding operation in 1990 near the Whitenton's home, the witness testified, "[W]e just couldn't cope, the odors were so foul ... we couldn't stand them." Whitenton described how the odor would come down the chimney of his fireplace. Whitenton testified that, because of the foul odor, he was forced to sell his property to the defendant.

The area where the calf facility is located was described as a rural agricultural area and as a residential retirement area. There was evidence that the calf facility was "the only one of its kind in Texas."

The Board presently exempts from the necessity of acquiring a permit, pursuant to "Standard Exemption Number 62," any "livestock animal feedlots designed to feed less than one thousand animals." Mark Gibbs, Permit Engineer for the Board, testified that it was the Board's position that any dairy in Erath County that had more than 1,000 head of cattle would have to get a permit from the Board.

The trial court made the following findings of fact:

16. Defendant's calf operation is normal, usual and natural in the *area and locality where it is situated.*

17. Any odor resulting from Defendant's operation is odor produced from a process that occurs in nature, and is affected or controlled by human devices only to an extent normal and usual *in the vicinity.* (Emphasis added)

Because of the many dairies located in the vicinity of the defendant's facility and based upon language contained in *Europak, Inc. v. County of Hunt,* 507 S.W.2d 884 (Tex.Civ.App.—Dallas 1974, no writ), and *Southwest Livestock and Trucking Company v. Texas Air Control Board,* 579 S.W.2d 549 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.), the trial court concluded that the Board had no jurisdiction over the odor in question due to an exclusion in the Clean Air Act.

The legislature stated in Section 382.002 of the Health & Safety Code that the purpose of the Clean Air Act is:

[T]o safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property, including the esthetic enjoyment of air resources by the public and the maintenance of adequate visibility.

"Air contaminant" is defined in Section 382.003(2) to be:

[P]articulate matter, radioactive material, dust, fumes, gas, mist, smoke, vapor, or *odor,* including any combination of those items, *produced by processes other than natural.* (Emphasis added)

*Europak* involved the proposed construction of a horse slaughtering and packing plant. The trial court granted a temporary injunction because Europak, Inc. failed to secure a permit from the Board. Europak argued that no permit was required because the odor from the horse manure would be produced by "natural" processes and would, therefore, be excluded from regulation under the Clean Air Act which defined "air contaminant" as odor "produced by processes other than natural." In rejecting Europak's contention, the Dallas Court stated:

[W]e hold that the trial court was justified in concluding that the odor from the pens was "produced by processes other than natural" within § 1.03(1). "Natural" is a word of many meanings. In Webster's New International Dictionary 1630 (2d ed. 1934), the definition of "natural" contains fifteen numbered paragraphs, of which the following are pertinent here:

Not artificial; in a state of nature, or produced by nature; as natural heat or color; a natural jewel; not abnormal; realizing the characteristic type; as, an imperfect crystal lacks its natural development....

In accordance with or due to the conditions, events, or circumstances of the case; in line with normal experi-

ence; as, a father is the natural protector of his children.

This definition indicates two separate but related concepts: (1) that which occurs in nature, as distinguished from that which is brought about by man's devices, and (2) that which occurs in the course of normal experience, as distinguished from the abnormal or unusual.

While holding that the odor from the horse manure would constitute an "air contaminant," the court said:

We conclude that the only interpretation which gives the words "produced by processes other than natural" any meaning consistent with the other provisions of the Act is to apply both the basic concepts expressed in the definition above quoted. In other words, a "natural process" is one that occurs in nature and is affected or controlled by human devices only to an *extent normal and usual for the particular area involved.* All other contaminants are "produced by processes other than natural" within the meaning of the Act. Accordingly, in this case we hold that the trial court was justified in concluding that the odor from the pens as well as from the building would be "produced by processes other than natural," since although the process which directly produces the odor may be one that occurs in nature, the evidence is sufficient to support a finding that concentration of such a large number of animals into such a small area would not be normal or usual *in this vicinity.* (Emphasis added)

*Southwest Livestock* involved an appeal from an order of the Board. The owner and operator of a livestock holding facility urged on appeal that the Board had no jurisdiction because the odors from the facility were "naturally" produced. The Tyler Court, following *Europak,* stated:

In the instant case appellant's holding pens are located well within the city limits of Del Rio, Texas, and have a maximum capacity for confining approximately 5000 head of livestock at one time. This maximum capacity is reached on 10 to 15 days per year, and the average number of livestock in the pens on a given day would be about 900 head. The administrative record is replete with competent evidence that private residence and service-oriented businesses are situated in close proximity to appellant's livestock facility. The record shows that these close neighbors, as well as private homes and businesses farther out, are adversely affected by the odors generated by appellant's livestock operation. *It should not be considered normal, usual or natural to find odoriferous livestock pens situated in such close proximity to urban land uses* such as homes and small commercial establishments which are particularly susceptible to strong odors. (Emphasis added)

The defendant in the instant case asserts that, since the trial court found that the defendant's operation and the emitting odor was normal and usual in the "area" and "vicinity" where the facility was located, the trial court correctly dismissed the State's petition.

The defendant argues that this Court is bound by the interpretation of the statute made by the courts in *Europak* and *Southwest Livestock* because the Clean Air Act was amended following those decisions and the amendment carried forward the same language considered in *Europak* and *Southwest Livestock.* The defendant relies upon the rule announced in *Coastal Industrial Water Authority v. Trinity Portland Cement Division, General Portland Cement Company,* 563 S.W.2d 916 (Tex.1978), that, when a statute is re-enacted without material change, it is presumed that the legislature knew and adopted the interpretation placed on the original act and intended the new enactment to receive the same construction.

We will apply the interpretation contained in *Europak* and *Southwest Livestock.* However, the defendant reads too narrowly the interpretation of "air contaminant" contained in those cases. It is significant that in both cases the contested "abnormal or unusual" event was the location of the facility; but *Europak* and *Southwest Livestock* should not be read to hold

that "location" is the only "abnormal or unusual" experience that can be considered in determining if an odor is produced by "natural" processes.

We hold that it is abnormal and unusual, without regard to location, to concentrate approximately 6,000 baby calves in 1,500 small hutches and in weaning pens. See *Smith v. Padgett*, 596 S.W.2d 530 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.) The odor at the defendant's calf feeding facility was not produced by natural processes. The trial court erred in dismissing the State's petition. The Texas Clean Air Act is applicable, and the Texas Air Control Board has jurisdiction.

The judgment of the trial court is reversed, and the cause is remanded.