F/R CATTLE COMPANY,
INC., Petitioner,

v.

The STATE of Texas, Respondent.

No. D–2481.

Supreme Court of Texas.

Nov. 24, 1993.

John B. Turney, Austin and Robert J. Glasgow, Stephenville, for petitioner.

Ken Cross, Suzanne Latting, and Dan Morales, Austin, for respondent.

## OPINION

GONZALEZ, Justice.

Respondent's motion for rehearing is overruled. Our opinion of April 21, 1993, is withdrawn and the following is substituted in its place.

This case involves the application of the Texas Clean Air Act[1] to a calf-feeding facility in Erath County. The State sought to enjoin F/R Cattle Company's operations under the Clean Air Act. The trial court held that the emissions were the product of natural processes excluded from regulation by the Act, and dismissed the suit for want of jurisdiction. The court of appeals determined that as a matter of law, this case comes within the purview of the Act, and reversed and remanded for further proceedings. 828 S.W.2d 303. We reverse the judgment of the court of appeals, and remand this cause to that court for consideration of the State's factual sufficiency points.

F/R Cattle Company commenced operation of the calf feeding facility in July 1990. The facility is located two and a half miles south of the town of Lingleville. There are approximately 21 dairies within a three mile radius of the F/R site. Each of these dairies have an average of approximately 500 full-grown dairy cows.

F/R's operation consisted of buying calves born at the local dairies and raising them to a weight of 250 to 300 pounds. The newborn calves were kept in 5–by–8 foot hutches with a sloping roof. F/R kept three calves to a hutch for 55 to 60 days, at which time they were moved to open pens. When the calves reach their desired weight at about four months, they were sold to feed lots or back to the dairies. At the time of suit, the operation maintained about 5,900 calves at any one time.

The Texas Air Control Board received numerous complaints regarding the odor associated with F/R's facility. As a result of these complaints, the State brought a suit on behalf of the Board against F/R seeking an injunction and civil penalties on the grounds that odors from F/R's calf-raising facility violated the Texas Clean Air Act by releasing air contaminants without a permit.

At the hearing on the State's petition for a temporary injunction, the trial court considered only F/R's plea to the jurisdiction of the court. After a full evidentiary hearing, the trial court made findings that F/R's operation is normal, usual, and natural in the area and locality where it is situated, that any odor resulting from F/R's operation is odor produced from a process that occurs in nature, and that the odor is affected or controlled by human devices only to an extent normal and usual in the vicinity. Specifically, the trial court found:

1. Defendant, F/R Cattle Company operates a confinement facility for dairy calves on the east side of FM 219, approximately 2.5 miles south of Lingleville and approxi-

---

1. Tex. Health & Safety Code §§ 382.001–.141 (Vernon 1992).

mately 7 miles north of Dublin, in Erath County.

2. Defendant commenced operations at its present site on approximately July 17, 1990.

3. The operation conducted by Defendant consists of raising calves acquired from dairies for 110 to 120 days at which time they are returned to the dairies or sold to other buyers.

4. After arrival, the calves are housed in wooden hutches for approximately 55 to 60 days at which time they are placed in pens.

5. The property immediately to the north of Defendant's operation is the site of a 520-head dairy.

6. There are approximately seven additional dairy operations between Defendant's operation and Lingleville.

7. There are approximately 21 dairy operations, with an average of approximately 500 cows each, and three horse ranches, within approximately a 3-mile radius of Defendant's operation.

8. The Pat Wilson property and residence is located approximately one-half mile east of Defendant's property.

9. The Weldon McConnell horse farm and residence is located approximately one-half mile south of Defendant's operation.

10. A residence leased by Ronnie McConnell is located across FM 219 approximately 100 yards from Defendant's operation, on the horse farm where Mr. McConnell works.

11. The Mary Martin property and residence is located approximately one-half mile north of Defendant's operation.

12. Another horse farm is located in the vicinity of Defendant's operation.

13. The area in which Defendant's operation is located is rural and agricultural.

14. On October 3, 1991, there were approximately 6,000 calves at Defendant's facility.

15. The amount of waste generated by 6,000 calves at Defendant's operation is approximately the amount of waste generated at a dairy of approximately 475 full grown dairy cows.

16. Defendant's calf operation is normal, usual and natural in the area and locality where it is situated.

17. Any odor resulting from Defendant's operation is odor produced from a process that occurs in nature, and is affected or controlled by human devices only to an extent normal and usual in the vicinity.

The trial court then dismissed the Board's suit on the grounds that the Board lacked jurisdiction over the facility because the facility was producing natural odors and therefore was excluded from the Clean Air Act. The court of appeals reversed and remanded the cause to the trial court to proceed with the State's complaints, based on its conclusion that, as a matter of law, the odor at the defendant's calf-feeding facility was not produced by natural processes.

## THE TEXAS CLEAN AIR ACT

The Texas Clean Air Act is codified at TEX. HEALTH & SAFETY CODE §§ 382.001–141. Its purpose is:

> [T]o safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property, including the aesthetic enjoyment of air resources by the public and the maintenance of adequate visibility.

*Id.* § 382.002. The Act confers on the Texas Air Control Board the authority to accomplish the Act's purposes through the control of "air contaminants." TEX. HEALTH & SAFETY CODE § 382.011(b).[2] An "air contaminant" is defined as:

> [P]articulate matter, radioactive material, dust, fumes, gas, mist, smoke, vapor, or odor, including any combination of those items, *produced by processes other than natural.*

2. The Texas Air Control Board was abolished on September 1, 1993, and all its powers, duties, responsibilities, and functions were transferred to the Texas Natural Resource Conservation Commission, pursuant to Act of July 30, 1991, 72nd Leg., 1st C.S., ch. 3, § 1.086, 1991 Tex. Gen.Laws 4, 42.

TEX. HEALTH & SAFETY CODE § 382.003(2) (emphasis added).[3] The statute explicitly excludes emissions produced by "natural processes," but does not elaborate what the legislature intended to exclude from regulation. The crux of the dispute between the parties is over the meaning of this phrase.

Two court of appeals opinions have interpreted the "natural processes" language. *Europak, Inc. v. County of Hunt*, 507 S.W.2d 884 (Tex.Civ.App.—Dallas 1974, no writ); *Southwest Livestock and Trucking Co. v. Texas Air Control Board*, 579 S.W.2d 549 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). In *Europak*, the County of Hunt and the State sought to prevent the defendant from constructing and operating a horse slaughter and packing facility without first obtaining a permit from the Air Control Board. The trial court issued a temporary injunction.

In the court of appeals, Europak took the position that the Act excludes all processes that occur in nature. The County and the State urged that the phrase should mean that which is natural or usual in the ordinary course of experience.

The court of appeals rejected both interpretations urged by the parties as the sole test, and held that the Act embraced aspects of both. The court observed that certainly much of agri-business was intended to be subject to the Act, but declined to construe the statute to mean that all processes involving human activity to any degree are not natural processes. It defined a "natural process" as "one that occurs in nature and is affected or controlled by human devices only to an extent normal and usual for the particular area involved." *Id.* at 891. The court noted that it is normal in Texas to put livestock in a pen or corral, and that a strict number criterion would not work. It ultimately upheld the trial court's injunction because, "although the process which directly produces the odor may be one that occurs in nature, the evidence is sufficient to support a finding that concentration of such a large number of animals into such a small area would not be normal or usual in this vicinity." *Id.* Thus, the court held that there was some evidence to uphold the trial court's findings of fact as against a legal sufficiency challenge.

In *Southwest Livestock*, the Board ordered the owner of a livestock holding facility to take corrective measures to bring its operations within the Board's rules and regulations. The trial court upheld the Board's order over the defendant's contest to the court's jurisdiction. The court of appeals reviewing the trial court's judgment followed the test adopted in *Europak*. *Southwest Livestock*, 579 S.W.2d at 552. It upheld the trial court's implied finding that the concentration of cattle pens was not normal, usual, or natural for the area where the pens were located because they were located well within city limits in close proximity to urban land uses such as residences and small commercial enterprises particularly susceptible to strong odors. *Id.*

In both *Southwest Livestock* and *Europak*, the case was tried to the trial court, and the courts of appeals upheld fact findings of the trial court. In the present case, the court of appeals disagreed with the trial court's findings:

> We hold that it is abnormal and unusual, without regard to location, to concentrate approximately 6,000 baby calves in 1,500 small hutches and in weaning pens. See *Smith v. Padgett*, 596 S.W.2d 530 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.). The odor at the defendant's calf feeding facility was not produced by natural processes. The trial court erred in dismissing the State's petition. The Texas Clean Air Act is applicable, and the Texas Air Control Board has jurisdiction.

828 S.W.2d 303, 306.[4]

Thus the court of appeals held that, regardless of the vicinity, the confinement of so

---

3. The definition was renumbered in 1991, although the language remained the same. § 2.01, 1991 Tex.Gen.Laws at 46.

4. In *Smith v. Padgett*, the court of appeals held that for purposes of the agricultural use classification of property for ad valorem taxes, the con- fined livestock operation under consideration was not the raising of cattle under natural conditions. 596 S.W.2d at 533. The opinion is not entirely clear, however, whether or not the court of appeals was merely upholding a trial court

many calves in such a small area was unnatural. F/R contends that the court of appeals has impermissibly substituted its view of the facts for that of the fact finder. In its reply brief, the State accepted the definition of "natural processes" articulated in *Europak* and *Southwest Livestock,* but argued that the issue of whether the odors from F/R's facility were the product of natural processes was a question of law decided correctly by the court of appeals.[5] At oral argument, the State went further and asked that we disapprove *Europak* and *Southwest Livestock* and give the Board jurisdiction wherever there is any human involvement with the production of an odor or other air contaminant, without regard to location.

■■■ We decline the State's invitation to depart from the holdings of *Europak* and *Southwest Livestock* and adopt the holdings of these cases that location is a factor to be considered in determining whether a pollutant was "produced by processes other than natural."[6] We must presume the language in Health and Safety Code section 382.003(2) excluding odors produced by natural causes from the definition of air contaminants was placed in the statute to serve some purpose. Given a literal reading the statute would exempt virtually all agricultural pursuits, and defeat the purpose of the Act. The State's interpretation of this language would extend the Board's jurisdiction to all farms, ranches, or households with pets regardless of where located, because by definition they include

human involvement with natural processes. This interpretation is unwarranted in light of the Act's legislative history.[7]

The definition of "air contaminants" in Texas Health and Safety Code section 382.003(2) was passed as part of the Clean Air Act of Texas. 59th Leg., R.S., ch. 687, § 2(A), 1965 Tex.Gen.Laws 1583.[8] The purpose of this Act was stated as protecting the State from pollution "consistent with the protection of normal health, general welfare and physical property of the people, maximum employment and full industrial development of the State." *Id.* § 1. Odor was not included in the definition of air contaminants.[9] *Id.* § 2(A). The 1965 Act instructed the Board to make allowances in any rules or regulations for differences between residential and other areas of the State. *Id.* § 6(B).

■■■ The State's alternative argument, that the test in *Europak* and *Southwest Livestock* is a question of law for the court is also problematic. The State offers no suggestion what standards the court might apply. As the court in *Europak* observed, a criterion based on the number of cattle would not suffice. At one end of the spectrum is a remotely located ranch with human involvement limited to fencing, feeding, and other typical ranching activities. At the other end of the spectrum is a feedlot located within city limits that clearly interferes with a neighbors' use of their property. In between, the circumstances would run the gam-

---

finding in the face of a challenge to the sufficiency of the evidence.

5. The Attorney General's office has prosecuted these proceedings on behalf of the Texas Air Control Board. The Texas Department of Agriculture, however, has filed an amicus curiae brief in this Court generally supporting F/R's position.

6. As noted in *Europak,* location is not the sole test. 507 S.W.2d at 891. Both *Europak* and *Southwest Livestock* arose in the context of agricultural pursuits clearly satisfying the first prong, emissions occurring in nature. Our holding should not be construed as affecting the Board's jurisdiction over industrial pollution.

7. *See Europak,* 507 S.W.2d at 891 (rejecting a definition of natural processes as "processes occurring wholly apart from human intervention" on the grounds that it would leave little if any

meaning to the statutory limitation set out in section 382.003(2)).

8. Amended by Clean Air Act of Texas, 1967, 60th Leg., R.S., ch. 727, 1967 Tex.Gen Laws 1941; Act of May 16, 1979, 66th Leg., R.S., ch. 726, 1979 Tex.Gen Laws 1787; Act of May 27, 1985, 69th Leg., R.S., ch. 637, 1985 Tex.Gen Laws 2350; Act of July 30, 1991, 72th Leg., 1st C.S., ch. 3, 1991 Tex.Gen Laws 4.

9. "Odors" were added to the list two years later, at the same time the legislature virtually created an exemption for cotton gins, even though some said that they were "one of the worst sources of pollution known to man." Norvell & Bell, *Air Pollution Control in Texas,* 47 TEX.L.REV. 1086, 1095 & n. 62 (1969) (discussing history of 1967 act); Clean Air Act of Texas, 1967, 60th Leg., R.S., ch. 727, §§ 2(A), 6(C), 1967 Tex.Gen.Laws 1941, 1942, 1948.

ut, so that making an evaluation of whether emissions are produced by natural processes is an inquiry best left to the fact finder.

In the case before us, the court of appeals accepted the *Europak* and *Southwest Livestock* standards, yet decided that the odors from F/R were inherently the result of processes other than natural regardless of where located. We disagree that a court could make this determination as a matter of law. There is some evidence that F/R's use is consistent with similar operations in the area. While this factor alone does not establish F/R's position as a matter of law, it nevertheless precludes the court of appeals from overturning the finding of the trial court on a legal sufficiency challenge. Accordingly, we remand this case to the court of appeals to review the State's remaining factual sufficiency points.[10]

PHILLIPS, C.J., and HECHT, HIGHTOWER and CORNYN, JJ., join in the opinion and the judgment.

ENOCH, J., concurs.

SPECTOR, J., joined by DOGGETT and GAMMAGE, JJ., dissents.

ENOCH, Justice, concurring.

I concur with the Court's opinion and judgment. The Clean Air Act confers on the Texas Air Control Board the authority to regulate air contaminants "produced by processes other than natural." Tex. Health & Safety Code § 382.003(2). Thus, the Board has jurisdiction over contaminants produced by *unnatural* processes and not over those produced by *natural* processes. As in this case, a question arises over whether a process is natural or unnatural when humans become involved in an otherwise natural activity. The majority holds that, in determin-

ing whether a typically natural process is made unnatural due to human activity, the trial court should consider whether the activity is normal and usual in the location involved. 866 S.W.2d at 201.

While I agree with the majority's ultimate conclusion, I would articulate more clearly the issue at the center of this dispute. The threshold issue in this case is simply who decides in any particular case whether the involvement of humans makes an otherwise natural process unnatural.[1] It is the province of the trial court to determine whether an otherwise natural activity that involves humans is still natural or has become unnatural for purposes of the Act.

SPECTOR, Justice, dissenting.

The dissenting opinion delivered April 21, 1993, is withdrawn, and the following is substituted in its place.

If the facility involved in this case were located in a city, the residents of the city could rely upon the Texas Air Control Board to safeguard the purity of their air. For the citizens of Erath County, however, there is no relief—only the continuing, overpowering odors emitted by a manifestly unnatural operation. This double standard is not only unfair; it is also contrary to the Texas Legislature's determined efforts to ensure clean air for all Texans, whether urban or rural. I dissent.

I.

Until three years ago, the area south of Lingleville, Texas was evidently pleasant country; in the words of David Whitenton, who built a retirement home there with his wife, it was a "nice community . . . nice place to live." The dairy farms in the area were

---

10. The dissent argues that our decision today forces average rural citizens like those of Erath County to bear the odors emanating from feedlots. The argument prejudges what the court of appeals may hold on remand. Moreover, even in cases in which agency enforcement is lacking, affected persons are not without a legal remedy. Texas Health and Safety Code section 382.004 specifically provides that the Act does not affect the right of a private person to pursue any and all common-law remedies available to abate or

recover damages for a condition of pollution, such as a nuisance action.

1. I agree with the dissent that the issue in this case involves the determination of the Board's jurisdiction. I disagree with the dissent's contention that, in the context of agricultural business, location should not be considered as a factor when determining whether the involvement of humans makes an otherwise natural process unnatural.

all "family-run operations," ranging in size from 120 to 650 cows.

In September of 1990, however, the atmosphere south of Lingleville took a dramatic turn for the worse. It was then that F/R Cattle Company began a calf-raising operation described by its owner as the first and only one of its kind in the State of Texas. In small, enclosed hutches, F/R Cattle placed some 6,000 calves, three to a hutch, for uninterrupted confinement of fifty-five to sixty days.

By all accounts, the odor emanating from F/R Cattle's facility is offensive. One fifty-year resident of Erath County likened the smell to "an open sewer pit." His son, a farm manager who has lived in the county for more than twenty years, described the odor as a "sour, rancid smell, very strong." A woman who has lived in the county for twenty-eight years, and who was raised on a dairy, stated that the odor near the facility is so intense that "you want to hold your nose." Another rancher stated that "it's just the most rancid smell you can imagine." Other testimony described the odor as "putrid," "awful," "a stench," "foul, very foul," and "rotten smelling."

For those in close proximity to the facility, the odor was totally unbearable. David Whitenton and his wife tried to shield themselves by sealing the house and closing the damper over the fireplace; but the odor would still make its way inside. So foul was the stench that the Whitentons were finally forced to move away.

Seeking to restore the quality of their air, the citizens of Erath County turned to the Texas Air Control Board for help. During F/R Cattle's first year of operation, the Board received fifty-four complaints against the company—more than the total it had received for all livestock operations throughout Erath County for the past four years combined. The Board then initiated this action under the Texas Clean Air Act, TEX. HEALTH & SAFETY CODE ch. 382.

## II.

The Texas Clean Air Act was created "to safeguard the state's air resources from pollution" in a manner "consistent with the protection of public health, general welfare, and physical property, including the esthetic enjoyment of air resources by the public." TEX. HEALTH & SAFETY CODE § 382.002(a). The Act's passage reflects the fact that "air pollution has come to be recognized as a problem to be eliminated rather than a curse to be endured." G. Todd Norvell and Alexander W. Bell, *Air Pollution Control in Texas*, 47 TEX.L.REV. 1086 (1969).

At the time it was proposed, the Texas Clean Air Act faced a "hornet's nest" of opposition from various industrial groups, including petroleum refiners, chemical manufacturers, and feed lot operators. *Id.* at 1091. These groups recognized, however, that some degree of air pollution control was inevitable; so they cooperated with legislators in drafting a bill. *Id.* at 1092. The result was a compromise that gave broad jurisdiction to the newly-created Air Control Board—on which industry was to have substantial representation—but which placed clear restraints on the Board's enforcement powers. *Id.;* see Clean Air Act of Texas, 59th Leg., R.S., ch. 687, 1965 Tex.Gen.Laws 1583. Subsequent legislatures followed the same approach; for example, when Texas cotton ginners pressed for an amendment exempting them from coverage, the legislature opted instead to retain the Board's jurisdiction over cotton gins while placing sharp limits on the remedies the Board could order. Norvell and Bell, *supra,* at 1095; see Clean Air Act of Texas, 1967, 60th Leg., R.S., ch. 727, § 6(C), 1967 Tex.Gen.Laws 1941, 1948.[1]

The present version of the Clean Air Act retains the same basic features of the original version: it confers broad jurisdiction on the Texas Air Control Board, while restricting its enforcement powers.[2] The Act

---

1. Section 6(C) provided in part that "[t]he board may not require in its rules and regulations that such plants meet a standard which requires an emission of less than eight percent of the process weight of the materials entering the process."

2. As of September 1, 1993, the Texas Air Control Board has been abolished and replaced by the Texas Natural Resource Conservation Commission. Act of July 30, 1991, 72nd Leg., 1st C.S., ch. 3, § 1.086, 1991 Tex.Gen.Laws 4, 42. The

charges the Board with jurisdiction over all non-natural processes that produce certain pollutants, including odors;[3] but in proceeding against polluters, the Board must comply with extensive, detailed statutory restrictions. *See id.*, §§ 382.011–.039 (powers and duties of board), 382.051–.063 (permits), 382.081–.096 (penalties and enforcement).

Several of these statutory restrictions concern the Board's consideration of location. The 60th Legislature, which enacted a revised version of the Clean Air Act, intended that rural areas be controlled less strictly than urban areas. *See* Norvell and Bell, *supra*, at 1096. Rather than limiting the Board's jurisdiction, however, the legislature adopted provisions directing the Air Control Board to take location into account in making its rules. *See* Clean Air Act of Texas, 1967, § 6(B), 1967 Tex.Gen.Laws at 1947–48. In their current form, those provisions provide in part:

> In adopting a rule, the board shall recognize that the quantity or characteristic of air contaminants or the duration of their presence in the atmosphere may cause a need for air control in one area of the state but not in other areas. In this connection, the board shall consider:
>
> (1) the factors found by it to be proper and just, including existing physical conditions, topography, population, and prevailing wind direction and velocity; and
>
> (2) the fact that a rule and the degrees of conformance with the rule that may be proper for an essentially residential area of the state may not be proper for a highly developed industrial area or a relatively unpopulated area.

Commission has all of the powers, duties, rights, and obligations formerly held by the Board. *Id.*, § 1.086(b)(2).

**3.** The Act directs the Board to "accomplish the purposes of this chapter through the control of *air contaminants* by all practical and economically feasible methods." Tex. Health & Safety Code § 382.011(b) (emphasis added). "Air contaminant" is defined to include numerous pollutants, including odors, "produced by processes other than natural." *Id.*, § 382.003(2).

**4.** This latter option, in fact, has recently received serious consideration. Senate Bill 684, rejected

TEX. HEALTH & SAFETY CODE § 382.017(e); *see also* §§ 382.024(1), –(3) (requiring the Board to consider location-related factors in issuing orders and making determinations). These provisions reflect the legislature's considered resolution of a difficult problem: the problem of making some degree of protection available to all Texans, while recognizing that what is acceptable in one area may not be acceptable in another.

The legislature certainly could have resolved this problem by exempting certain areas, such as heavily-polluted regions, from the Board's jurisdiction. Alternatively, it could have defined "air contaminant" to exclude pollutants that have become commonplace in a particular area; or it could have exempted certain agricultural operations from the permitting requirements for air contaminant emissions.[4] The legislature chose, however, to adhere to the approach it has always taken in revising the Clean Air Act: it afforded broad jurisdiction to the Air Control Board, together with clear instructions to the Board to consider location-related factors when carrying out its responsibilities.

The legislature's definition of "air contaminant" contains no reference to location; but the majority, rejecting a literal reading of that definition as "unwarranted," engrafts a location factor onto the legislature's definition by announcing that "location is a factor to be considered in determining whether a pollutant was 'produced by processes other than natural.'" 866 S.W.2d at 204. To support this rewriting of the statute, the majority relies upon two lower-court decisions, both of which upheld the Air Control Board's jur-

by the Texas Legislature earlier this year, would have exempted certain agricultural operations—including livestock and poultry operations—from the permitting requirements of the Clean Air Act, except in certain circumstances.

The approach taken by the majority is comparable to the approach of Senate Bill 684: whenever livestock or poultry operations are concentrated in a particular area, those operations will effectively be exempted from the requirements of the Clean Air Act on the ground that they are "normal and usual" for the area. Today's opinion thus accomplishes, in large measure, the same outcome the legislature rejected only months ago.

isdiction over particular contaminants. *Southwest Livestock and Trucking Co. v. Texas Air Control Bd.*, 579 S.W.2d 549 (Tex. Civ.App.—Tyler 1979, writ ref'd n.r.e.); *Europak, Inc. v. County of Hunt*, 507 S.W.2d 884 (Tex.Civ.App.—Dallas 1974, no writ).

Given the favorable outcomes of those cases, the Board never sought review in this Court of the rule the majority adopts today. Moreover, neither opinion has previously been construed to restrict the Air Control Board's jurisdiction; in fact, like the court of appeals in the present case, the only prior court relying on *Southwest Livestock* and *Europak* understood them as holding that "odors produced by the confinement of a large number of animals in a small space are not produced naturally." *Smith v. Padgett*, 596 S.W.2d 530, 533 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.).

The majority's ruling ignores the history of the Texas Air Control Act, and unjustifiably usurps the authority of the Texas Air Control Board. As the legislature recognized, courts lack the expertise necessary to formulate and apply standards for regulating air pollutants. The Act thus gives the Board—not the courts—the responsibility to consider location-related factors in enforcing this state's pollution laws. Under the Act, if a person affected by an action of the Board seeks judicial review, the only issue to be determined in court is "whether the [Board's] action is invalid, arbitrary, or unreasonable." TEX. HEALTH & SAFETY CODE § 382.032(e). Under the majority's decision, however, the Board's authority in a given location will be determined at the outset in court, where a factfinder must decide whether the process in question is "normal and usual for the particular area involved."

When the Board's jurisdiction is challenged, a court must certainly determine whether the particular pollutant is "produced by processes other than natural." Whether a particular process is "natural," however, has nothing to do with its location. *See, e.g.,* WEBSTER'S NEW WORLD DICTIONARY 947 (2d

college ed. 1986) (defining "natural"). The only role that location plays under the Clean Air Act is in the determination of remedies— a function that the legislature deliberately assigned to the Board, subject only to limited review in court. TEX. HEALTH & SAFETY CODE § 382.032(e).

The facts of this case demonstrate the hazards of shifting broad responsibility for fact-finding from the agency to the courts. The trial court found that F/R Cattle's facility was "normal, usual and natural in the area and locality where it is situated," and that the process creating odors at the facility was "affected or controlled by human devices only to an extent normal and usual in the vicinity." As discussed above, all of the evidence at trial—including statements from F/R Cattle's owner—indicated that the operation at issue is abnormal and unusual in the vicinity.

The majority concludes, without explanation, that "[t]here is some evidence that F/R's use is consistent with similar operations in the area." 866 S.W.2d at 205.[5] The only evidence the majority cites, however, is that the twenty-one dairies within three miles of F/R Cattle have an average of 500 cows, as compared with 5,900 calves at F/R Cattle's facility. By some standard, this might be evidence that F/R Cattle's use is normal and usual for the area; but what is the standard, and how are future courts to apply it?

### III.

The majority's decision will not be of any help to the small farmers and ranchers of this state. By regulation, the Air Control Board automatically exempts from the Clean Air Act feedlots designed to feed less than 1,000 animals.

The majority's decision will, however, affect average rural Texans like the farmers, ranchers, and retired citizens of Erath County, who must continue to bear the odors

---

**5.** This standard—asking whether the process is "consistent with" other operations in the area— is different from the standard the majority claims to adopt, which focuses on whether the process is "normal and usual" for the area. *See South-*

*west Livestock,* 579 S.W.2d at 552; *Europak,* 507 S.W.2d at 891. In view of the remainder of the majority's opinion, however, I assume that the majority actually means to adopt the *Europak* standard.

emanating from the F/R Cattle Company facility. A number of these individuals have filed amicus curiae briefs before this court, stating, among other things, that they have been unable to remain outside;[6] their property values have plummeted;[7] and they have been stripped of their right to clean air.[8]

The rural citizens of Texas are entitled to bring their complaints regarding air quality to the Texas Air Control Board, and to have those complaints investigated and appropriate action taken. The majority has today approved a nonsensical approach to environmental protection: as the air quality deteriorates, so does the Board's jurisdiction. Because the Air Control Board has jurisdiction under the Texas Clean Air Act, I would affirm the judgment of the court of appeals.

DOGGETT and GAMMAGE, JJ., join in this dissenting opinion.

---

**6.** Amicus Curiae brief filed by S. John Welsh, Ronnie McConnell, Bill Keller, Weldon McConnell, and Bill Kelly, who describe themselves as rural residents of "an unincorporated retirement community who ... have suffered [from] the putrid and rancid odors," at 1.

**7.** *Id.*

**8.** Amicus Curiae brief filed by Cross Timbers Concerned Citizens (a non-profit group of approximately 200 members concerned with the quality of life in Erath and surrounding counties), at 2.