[No. C014827. Third Dist. Sept. 30, 1994.]

NATURAL RESOURCES DEFENSE COUNCIL, Plaintiff and Respondent, v.
FISH AND GAME COMMISSION, Defendant and Appellant; BUILDING INDUSTRY ASSOCIATION OF SOUTHERN CALIFORNIA, et al., Interveners and Appellants.

1106

COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, Edna Walz and William D. Cunningham, Deputy Attorneys General, for Defendant and Appellant.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., William M. Boyd, Richard C. Jacobs, Nossaman, Guthner, Knox & Elliott, Robert J. Sullivan, Robert D. Thornton, John J. Flynn III and Paul R. Johnson for Interveners and Appellants.

Joel R. Reynolds, Michael D. Fitts, Hufstetler, Kaus & Ettinger, Burton J. Gindler, Laura Fashing, Remy & Thomas, J. William Yeates and Whitman F. Manley for Plaintiff and Respondent.

OPINION

DAVIS, Acting P. J.—In this appeal, we interpret a procedural provision in the California Endangered Species Act (CESA). (Fish & G. Code, § 2050 et seq.; all further references to undesignated code sections will be to the Fish and Game Code unless otherwise specified.) That provision guides the Fish and Game Commission (Commission) in determining whether to list a species as a candidate for "endangered" or "threatened" classification, and requires the Commission to find "that the petition [requesting endangered or threatened listing] provides sufficient information to indicate that the petitioned action may be warranted . . . ." (§ 2074.2.)[1] The specific issue here concerns the evidentiary standard embodied in the section 2074.2 phrase, "sufficient information to indicate that the petitioned action may be warranted." We interpret the phrase to mean that amount of information—when

---

[1] The CESA petition process includes listing and "delisting" a species regarding the endangered or threatened lists. (See §§ 2070, 2071.) Our focus in this appeal is on the listing process.

considered in light of the Department of Fish and Game's written report and the comments received (see § 2074.2)—that would lead a reasonable person to conclude there is a "substantial possibility" the requested listing "could" occur (as the term "substantial possibility" is comparatively defined herein). This interpretation differs from the one adopted by the trial court. Consequently, we affirm in part and reverse in part.

BACKGROUND

In early 1991, the Natural Resources Defense Council (NRDC) and the Manomet Bird Observatory petitioned the Commission seeking listing of the California Gnatcatcher, a songbird (polioptila californica californica), as an endangered species under CESA. (§ 2071.) As required by statute, the Commission referred the petition to the Department of Fish and Game (Department). (§ 2073.) After initially evaluating the petition, the Department concluded that the document contained sufficient information to indicate that the petitioned action may be warranted; accordingly, the Department recommended that the Commission accept the petition for consideration and list the California Gnatcatcher as a candidate for "endangered" classification. (§ 2073.5.)

The Commission considered the petition at three public meetings in the summer of 1991. It ultimately concluded, in a 3-1 decision, that the petition did not "provide sufficient information to indicate that the petitioned action may be warranted." The Commission then formally adopted findings regarding this conclusion.

In late 1991, NRDC filed a petition for writ of (administrative) mandate and complaint for declaratory relief challenging the Commission's action. (See § 2076.) The Building Industry Association of Southern California (BIA), as well as the Foothill/Eastern Transportation Corridor Agency and the San Joaquin Transportation Corridor Agency, timely intervened in the action.

At trial, NRDC argued that the Commission should decide in favor of candidacy when the evidence in the petition provides "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." NRDC, therefore, argued for a low threshold test for candidacy determination, one patterned after the fair argument standard in the California Environmental Quality Act (CEQA) for determining whether an environmental impact report on a project should be prepared.

The Commission, joined by the interveners, countered NRDC's argument by noting the consequential distinctions between deciding whether an environmental impact report should be prepared and whether to list a candidate

species under CESA. Focusing on the Commission's quasi-adjudicative responsibilities regarding candidacy determination, and alleging that such a determination operates effectively as a preliminary injunction protecting the habitat of the candidate species, the Commission and the intervenors argued at trial that the Commission should decide in favor of candidacy, in the Commission's words, "*only* where . . . , based on the evidentiary record, it is reasonably probable that [the Commission's] ultimate determination would be to find the candidate species endangered [or threatened, as the case may be]." (Italics in original.)

The trial court expressly rejected the fair argument standard advocated by NRDC, implicitly rejected the reasonable probability standard tendered by the Commission and the intervenors, and, as that court said, "described [an evidentiary standard] more reflective of the language and intent of Fish and Game Code 2074.2." The standard adopted by the trial court specified that "the commission could not permissibly reject a petition [under section 2074.2] which presented substantial evidence indicating a need for listing, i.e., such relevant and credible evidence which, considered with other evidence before the commission, a reasonable mind might accept as adequate to support a conclusion that listing was necessary."

In its judgment granting a peremptory writ of mandate, the trial court remanded the proceedings to the Commission. The court directed the Commission to prepare new findings in accord with the evidentiary standard the court had formulated and the requirements regarding administrative-finding specificity set forth in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]. The Commission and the interveners then appealed, challenging principally the evidentiary standard formulated by the trial court.[2]

## DISCUSSION

 In this appeal we are asked to determine the evidentiary standard embodied in the section 2074.2 phrase, "sufficient information to indicate that the petitioned action may be warranted."[3]

Certain rules of statutory construction guide our interpretation. The basic objective of statutory interpretation is to ascertain and effectuate legislative

[2]We requested supplemental briefing regarding the effect, if any, of the Natural Community Conservation Planning Program and the gnatcatcher preservation plan on this appeal. The parties and the interveners agreed there was no effect.

[3]The intervener BIA argues, at one point, that we should not determine the evidentiary standard until the Commission has had a chance to prepare new findings that meet the *Topanga* requirements. However, as the other parties in this appeal acknowledge, it makes sense to provide the Commission with an evidentiary standard by which to prepare those new

intent. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [11 Cal.Rptr.2d 222].) "In ascertaining legislative intent, we read the words of the statute according to their 'usual, ordinary, and common sense meaning' consistent with the statute's apparent purpose . . . ." (*Al-Sal Oil Co.* v. *State Bd. of Equalization* (1991) 232 Cal.App.3d 969, 976 [283 Cal.Rptr. 843].) " 'When the [statutory] language is clear and unambiguous, there is no need for construction. . . . ▊ When the language is susceptible of more than one reasonable interpretation, [as it is here], we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Department of Fish & Game, supra*, 8 Cal.App.4th at p. 1562, quoting *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154], citation omitted.)

### 1. *An Overview of CESA Regarding Candidate Species*

California was one of the first states in the Union—if not the first—to enact a statutory scheme to protect endangered and rare animals, doing so in 1970. (Stats. 1970, ch. 1510, § 3, p. 2998; see former § 2050 et seq.) Fourteen years later, this scheme was repealed and a new one—known as the "California Endangered Species Act" (CESA; see § 2050)—was put in its place.

In CESA, the Legislature found and declared that certain species of fish, wildlife and plants have been rendered extinct as a consequence of man's activities; that other species of fish, wildlife and plants are in danger of or threatened with extinction because their habitats are threatened with destruction, adverse modification or severe curtailment, or because of overexploitation, disease, predation, or other factors; and that these species are of ecological, educational, historical, recreational, esthetic, economic, and scientific value to the people of California, and the conservation, protection and enhancement of them and their habitat is of statewide concern. (§ 2051.)

The Legislature, in CESA, further found and declared it to be state policy to conserve, protect, restore and enhance any endangered species or any

findings. Furthermore, as the trial court noted, the issue of the evidentiary standard was extensively briefed and argued in the trial court and the Commission there set forth its views on the matter. Most significantly, the Commission itself says the evidentiary standard issue is before this court. It is therefore appropriate for us to decide this issue now. (*Contrast No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 82-83, fn. 15 [118 Cal.Rptr. 34, 529 P.2d 66].)

threatened species and its habitat (§ 2052); that state agencies should not approve projects[4] as proposed which would jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat essential to the continued existence of those species, if there are reasonable and prudent alternatives available consistent with conserving the species or its habitat that would prevent jeopardy (§ 2053); that reasonable and prudent alternatives must be developed by the Department, together with the project proponent and the state lead agency (on the project), consistent with conserving the species, while at the same time maintaining the project purpose to the greatest extent possible (§ 2053); that in the event specific economic, social, or other conditions make infeasible such alternatives, individual projects may be approved if appropriate mitigation and enhancement measures are provided (§ 2054); and that all state agencies, boards, and commissions shall seek to conserve endangered and threatened species and shall use their authority to do so (§ 2055).

As noted by one commentator, "[w]hile these sections provide that it is state policy to conserve endangered and threatened species [and, we add, the term "conserve" is defined broadly to mean the use of all methods so that CESA protection is no longer necessary—see § 2061], this policy is tempered with a requirement that it be imposed in a 'reasonable' fashion. For example, while . . . CESA would require the development of 'reasonable and prudent alternatives' to a project which would jeopardize the continued existence of any endangered or threatened species, . . . individual projects [may be allowed] to proceed if [specific] 'economic, social or other conditions make infeasible such . . . alternatives . . . [so long as] appropriate mitigation and enhancement measures are provided.' " (See Somach, *The Excess in the Environmental Regulation of the Water Resource* (1989) 20 Pacific L.J. 337, 349-350; hereafter, Somach 20 Pacific L.J.)

Under CESA, the Commission "shall establish a list of endangered species and a list of threatened species" and "shall add or remove species from either list if it finds, upon the receipt of sufficient scientific information pursuant to this article, that the action is warranted." (§ 2070.) " 'Endangered species' means a native species or subspecies of a bird, mammal, fish, amphibian, reptile, or plant which is in serious danger of becoming extinct throughout all, or a significant portion, of its range due to one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, or disease." (§ 2062.) "Threatened species" means any such species or subspecies "that, although not presently threatened with extinction, is likely

---

[4]The term "project" in CESA carries the CEQA definition of project. (§ 2064; see Pub. Resources Code, § 21065.)

to become an endangered species in the foreseeable future in the absence of the special protection and management efforts required by [CESA]." (§ 2067.)

Pursuant to CESA, "an interested person may petition the [C]ommission to add a species to, or to remove a species from either the list of endangered or the list of threatened species." (§ 2071.) (The Department, in the absence of a petition, may recommend that the Commission take such action. (§ 2072.7).) To be accepted, "a petition shall, at a minimum, include sufficient scientific information that a petitioned action may be warranted." (§ 2072.3.) A petition must include information regarding the kind of habitat necessary for species survival, the population trend, range, distribution, abundance and life history of a species, the factors affecting the ability of the population to survive and reproduce, the degree and immediacy of the threat, the impact of existing management efforts, suggestions for future management, a detailed distribution map, and the availability and sources of information used for the petition. (§ 2072.3.)

The Commission refers the petition to the Department, which "evaluate[s] the petition" and reports on it within 90 days. (§§ 2073, 2073.5.) In its report, the Department recommends either that the "petition should be rejected" because it does not contain "sufficient information to indicate that the petitioned action may be warranted" or that the "petition should be accepted and considered" because it does. (§ 2073.5.)[5] After receiving the Department's report, the Commission schedules a public meeting to consider the petition and distributes the meeting's agenda to interested persons. (§ 2074; see § 2078.) It is at this juncture that we arrive at the statute at issue here—section 2074.2. Section 2074.2 provides:

"(a) At the scheduled meeting, the [C]ommission shall consider the petition, the [D]epartment's written report, and comments received, and the [C]ommission shall make and enter in its public record one of the following findings:

"(1) If the [C]ommission finds that the petition does not provide sufficient information to indicate that the petitioned action may be warranted, the [C]ommission shall publish a notice of finding that the petition is rejected, including the reasons why the petition is not sufficient.

---

[5]Section 2073.5 provides: "Within 90 days, the [D]epartment shall evaluate the petition, and report one of the following recommendations to the [C]ommission: (a) Based upon the information contained in the petition, there is not sufficient information to indicate that the petitioned action may be warranted, and the petition should be rejected. (b) Based upon the information contained in the petition, there is sufficient information to indicate that the petitioned action may be warranted, and the petition should be accepted and considered."

"(2) If the [C]ommission finds that the petition provides sufficient information to indicate that the petitioned action may be warranted, the [C]ommission shall publish a notice of finding that the petition is accepted for consideration. If the accepted petition recommends the addition of a species to either the list of endangered species or the list of threatened species, the [C]ommission shall include in the notice that the petitioned species is a candidate species. The [C]ommission shall maintain a list of species which are candidate species.

"(b) The [C]ommission shall publish and distribute the findings relating to the petition pursuant to Section 2078."

After a "petition is accepted by the [C]ommission for consideration" (§ 2074.4), the Department reviews the status of the species. (§ 2074.6.) Within 12 months, the Department must provide a written report to the Commission, based upon the best scientific information available to the Department, which indicates whether the petitioned action "is warranted." (*Ibid.*)[6] After receiving this report, the Commission schedules a public meeting at which it finds that the petitioned action either "is warranted" or "is not warranted." (§ 2075.5.)[7]

Thus, CESA sets forth a two-step process by which the Commission determines whether to list a species as endangered or threatened (unless the Commission finds there is an emergency—see section 2076.5.) In the first step the Commission determines whether a species is a candidate for listing

---

[6]Section 2074.6 provides: "The [D]epartment shall promptly commence a review of the status of the species concerned in the petition. Within 12 months of the date of publication of a notice of acceptance of a petition for consideration by the [C]ommission pursuant to paragraph (2) of subdivision (a) of Section 2074.2, the [D]epartment shall provide a written report to the [C]ommission, based upon the best scientific information available to the [D]epartment, which indicates whether the petitioned action is warranted, which includes a preliminary identification of the habitat that may be essential to the continued existence of the species, and which recommends management activities and other recommendations for recovery of the species."

[7]Section 2075.5 provides: "At the meeting scheduled pursuant to Section 2075, the [C]ommission shall make one of the following findings: (1) The petitioned action is not warranted, in which case the finding shall be entered in the public records of the [C]ommission and the petitioned species shall be removed from the list of candidate species maintained pursuant to Section 2074.2. (2) The petitioned action is warranted, in which case the [C]ommission shall publish a notice of that finding and a notice of proposed rulemaking pursuant to Section 11346.4 of the Government Code to add the species to, or remove the species from, the list of endangered species or the list of threatened species. Further proceedings of the [C]ommission on the petitioned action shall be made in accordance with Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code."

by determining whether the petition—when considered with the Department's written report and the comments received—provides sufficient information to indicate that endangered or threatened listing "may be warranted." If this hurdle is cleared, the petition is "accepted for consideration" and the second step begins: the Department conducts a (roughly) year-long scientific-based review of the subject species, reports to the Commission, and then the Commission determines whether listing of the candidate as an endangered or threatened species "is [or] is not warranted." These determinations by the Commission are subject to judicial review under Code of Civil Procedure section 1094.5. (§ 2076.)[8]

An endangered or threatened species generally cannot be imported, exported, possessed, bought, sold or taken. (§ 2080.) If proper notice is given, these protections extend to candidate species as well. (§ 2085; see § 2074.4.)[9]

However, subject to the terms and conditions it prescribes, the Commission may authorize the taking of any candidate species. (§ 2084.)

Furthermore, the principal state agency authorizing, funding or carrying out a project or action must consult with the Department to ensure that any such activity is not likely to jeopardize the continued existence of any endangered or threatened species. (§ 2090.) Although this protection is not afforded to candidate species, if the principal agency or project proponent so requests, the Department shall grant an informal consultation on any proposed project which may affect a candidate species. (§ 2096.) In section 2096, the Legislature states its intent "to facilitate the resolution of potential conflicts between candidate species and proposed projects on the basis of information available at the time, and not to require the alteration of project processing schedules pending final determination of the status of any candidate species."

---

[8]Section 2076 states that "[a]ny finding pursuant to this section is subject to judicial review under Section 1094.5 of the Code of Civil Procedure."

[9]Section 2085 provides: "The provisions of this article [article 3—Taking, Importation, Exportation, or Sale] shall apply to any species designated as a candidate species under Section 2074.2 if notice has been given pursuant to Section 2074.4."

Section 2074.4 states: "If a petition is accepted by the [C]ommission for consideration, all reasonable attempts shall be made to notify affected and interested parties and to solicit data and comments on the petitioned action from as many persons as is practicable. In addition to [C]ommission efforts to provide notification through distribution of the [C]ommission agenda and minutes pursuant to Section 2078, the [D]epartment shall immediately undertake efforts to notify affected and interested parties. Methods of notification may include, but are not limited to, correspondence, newspaper notices, and press releases, and notification shall include notice to owners of that land which may provide habitat essential to the continued existence of the species, unless the director determines that ownership is so widespread, fragmented, or complex as to make individual notice impractical."

## 2. *The Evidentiary Standard Embodied in Section 2074.2*

That brings us to the specific issue we are asked to determine: what evidentiary standard is the *Commission* to use in applying the section 2074.2 phrase—"petition [requesting listing] provides sufficient information to indicate that the petitioned action may be warranted." Recall that under section 2074.2, if the Commission finds that the petition—when considered with the Department's written report and the comments received—"does not provide sufficient information to indicate that the petitioned action may be warranted," the Commission is to reject the petition. But under section 2074.2, if the Commission finds that the petition—when considered with the report and comments noted above—"provides sufficient information to indicate that the petitioned action may be warranted," the Commission shall accept the petition for consideration. It is important to emphasize that we are determining an evidentiary standard—essentially a standard describing a burden of proof—for the *Commission to use in deciding* whether to list a species as a candidate; we are not determining a standard of *judicial review* of the Commission's decision.

At the outset, we can say with some assurance that the CEQA fair argument standard sets too low a threshold for section 2074.2 and the trial court correctly rejected it. This is principally because the section 2074.2 determination is a quasi-adjudicatory one that contemplates the Commission weighing the evidence for and against candidate listing and deciding essentially a question of fact in the process. Section 2076 states that any Commission finding is subject to judicial review under Code of Civil Procedure section 1094.5. Section 1094.5 specifies that it applies only to an administrative decision "made as the result of a proceeding in which by law a *hearing is required* to be given, *evidence is required* to be taken and *discretion in the determination of facts* is vested in the inferior tribunal . . . ." (§ 1094.5, subd.(a), italics added.) By contrast, the fair argument determination poses a question of law that does not contemplate a weighing of evidence and a discretion to determine a fact: if there is substantial evidence to support a fair argument, that is the end of the matter even if there is substantial evidence in opposition. (See former Pub. Resources Code, § 21080, subd. (c)(1); *Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424,433-434, fn. 4 [187 Cal.Rptr. 53]; *Oro Fino Gold Mining Corp.* v. *County of El Dorado* (1990) 225 Cal.App.3d 872, 880-881 [274 Cal.Rptr. 720]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514]; *Sierra Club* v. *County of Sonoma* (1992) 6

Cal.App.4th 1307, 1317 [8 Cal.Rptr.2d 473] ["the question is one of law, i.e., the 'sufficiency of the evidence to support a fair argument' "].)[10]

These same reasons render the trial court's substantial evidence standard inappropriate, because that standard is akin in many respects to the fair argument standard. Although the trial court's substantial evidence standard correctly recognizes that the Department's report and the public comments must be considered in the evidentiary equation in determining whether the petition presents sufficient information under section 2074.2, the standard incorporates the substantial evidence standard of judicial review as its core. In this way, the trial court's substantial evidence standard operates like the fair argument standard and therefore suffers from the same defects.

Determining what the subject phrase in section 2074.2 decidedly is not, however, does not take us a long way toward determining what the Legislature actually had in mind. ■ Fortunately, there is some guidance—at least regarding the "sufficient information" component of the section 2074.2 phrase. Unfortunately, there is little to guide us regarding the more critical component of "may be warranted."

The "sufficient information" component has a parallel in the federal Endangered Species Act (FESA). Under FESA, candidacy determination rests on whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." (16 U.S.C.A. § 1533(b)(3)(A).)[11] Under CESA, the question is whether "the petition provides sufficient information to indicate that the petitioned action may be warranted." (§ 2074.2.) The similarity in language is apparent and the legislative history shows that CESA was patterned after FESA in this

---

[10]The term "*quasi*-adjudicatory" is an apt characterization of the section 2074.2 process since that process encompasses both adjudicative and legislative-like elements. Although the procedure envisioned in section 2074.2 calls essentially for a determination of fact, that determination is not confined to a discrete dispute and a narrow set of litigants. In *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134], the court distinguished between " 'adjudicatory' matters in which 'the government's action affecting an individual [is] determined by facts peculiar to the individual case' " and " 'legislative' decisions which involve the adoption of a 'broad, generally applicable rule of conduct on the basis of general public policy.' " (*Id.* at p. 613, quoting *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 212-213 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) In the section 2074.2 process, this distinction is not a clear one and both adjudicative and legislative elements are present.

[11]"Commercial information" means trade data. It does not imply that candidacy determination encompasses an economic component. (See H.R.Rep. No. 97-567 (1982) 1982 U.S. Code Cong. & Admin. News 2807, 2820; House Conf. Rep. No. 97-835 (1982) 1982 U.S. Code & Admin. News 2860, 2861.) Like CESA, candidacy determination under FESA is to be based on science, not economics. (*Ibid.*; see §§ 2072.3, 2074.6.)

respect. (Enrolled Bill Rep. (Assem. Bill No. 3270) Cal. Resources Agency, Dept. of Fish & Game, Sept. 1984; Bill Analysis Work Sheet (Assem. Bill No. 3270) Assembly Water, Parks and Wildlife Com.; Bill Analysis (Assem. Bill No. 3270) Cal. Resources Agency.)[12] Both statutory schemes contemplate a two-step process with the first step being a scientifically based candidacy determination. (See 16 U.S.C.A. § 1533(b), (c); §§ 2074.2, 2074.6, 2075.5.) Given these patterned similarities in language, structure and focus, it is appropriate to consult federal authority to help interpret this language. "[I]t is a basic premise of statutory construction that when a state law is patterned after a federal law, the two are construed together." (*Moreland* v. *Department of Corporations* (1987) 194 Cal.App.3d 506, 512-513 [239 Cal.Rptr. 558].)[13]

The federal Departments of Commerce and Interior, the agencies charged with administering FESA, have defined in a regulation the term "substantial information" in the statutory phrase "substantial scientific or commercial information indicating that the petitioned action may be warranted." " 'Substantial information' is that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." (50 C.F.R. § 424.14(b) (1992).)

Aside from the deliberate similarities in language, structure and focus noted above, there are additional reasons to deem this regulatory definition a persuasive guide in defining the term "sufficient information" in section

[12]Of course, CESA uses the term "sufficient information," while FESA employs "substantial information." There is not any material distinction between the two terms in the listing context. In discussing the 1982 amendments to FESA, the House Conference Report No. 97-835 refers to the term "substantial information" and notes: "The amendments do not change the amount of information needed to warrant a status review of the species. As under the existing law, the petitioners need only present *information sufficient to indicate* that addition to, or removal from, the list may be warranted and, thus, that a status review of the species should be conducted." (House Conf. Rep. No. 97-835, *supra*, 1982 U.S. Code Cong. & Admin. News at p. 2861, italics added; see also H.R.Rep. No. 97-567, *supra*, 1982 U.S. Code Cong. & Admin. News at p. 2820.) Accordingly, under this part of FESA, "substantial information" is equated to "sufficient information." As noted, CESA was patterned after FESA in this respect. The parties concede the parallel nature of these specific terms.

As we shall see later, however, this does not mean that the terms "sufficient" and "substantial" have the same meaning in all contexts. These terms are so flexible, in fact, that if they are rendered devoid of their context, they are largely rendered devoid of their meaning.

[13]For an important reason, however, the analogy cannot be taken too far. Unlike CESA, FESA generally does not afford protection to candidate species. (See 16 U.S.C.A. §§ 1533(b), (d), 1538.) FESA contemplates only a study process at this point. (*Id.* at § 1533(b); see also *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 202 [132 Cal.Rptr. 377, 553 P.2d 537].) Nevertheless, federal authority provides a useful interpretive guide in the limited context of the "substantial/sufficient information" component.

2074.2. One such reason is timing. The federal "substantial information" regulatory definition quoted above was first proposed in August 1983, and formally adopted in October 1984. (See 48 Fed.Reg. 36062 [Aug. 8, 1983]; 49 Fed.Reg. 38900 [Oct. 1, 1984].)[14] CESA was enacted in September 1984. (Stats. 1984, ch. 1240.) Given that CESA was patterned after FESA in this respect, the drafters of CESA may well have been aware of this parallel federal interpretation and its significance in construing CESA. (See *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235, fn. 7 [5 Cal.Rptr.2d 782, 825 P.2d 767].)

This federal regulatory definition also aligns with the underlying interpretive principle embodied in CESA. CESA expresses a strong state policy of conserving endangered and threatened species, but the statutory framework tempers this policy with a requirement that it be imposed in a "reasonable" way. (See §§ 2051-2056, 2061, 2096; see also Somach, 20 Pacific L.J. at pp. 349-350.) The federal definition of "substantial information" is grounded in the context of the "reasonable person."

We conclude the term "sufficient information" in section 2074.2 means that amount of information, when considered with the Department's written report and the comments received, that would lead a reasonable person to conclude the petitioned action may be warranted. ■ Now we come to the more arduous part of our task—ascertaining the legislative intent regarding the phrase "may be warranted."

A backdrop of preliminary observations is provided by our high court's decision in *No Oil, Inc., Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66]. There the court interpreted the CEQA provision mandating that an environmental impact report (EIR) be prepared for projects "which may have a significant effect on the environment." In discussing the terms "may" and "significant," the court noted they were not terms of precision but encompassed a range of meaning. These terms, said the court, "cannot be adequately defined by a random selection of synonyms from a thesaurus. Facing a spectrum of possible meanings . . . the court's task is to indicate the point on this spectrum [that implements the legislative purpose]." (*Id.* at p. 83, including fn. 16.) These views are equally relevant to the term "may be warranted," and are confirmed by the elastic definition of the word "may": "an auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency." (Black's Law Dict. (6th ed. 1990) p. 979.)

In *No Oil, Inc.*, the court defined the word "may," in the phrase "may have a significant effect," as a "reasonable possibility." (13 Cal.3d at pp.

---

[14]We grant NRDC's request of judicial notice. (Evid. Code, §§ 452, 459.)

83-84; see *Oro Fino Gold Mining Corp* v. *County of El Dorado, supra,* 225 Cal.App.3d at p. 881; and *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 309 [248 Cal.Rptr. 352].) This definition was meant to impose a low threshold requirement for preparation of an EIR, calling for preparation whenever it could be "fairly argued" that the project may have a significant environmental effect. (13 Cal.3d at pp. 84-85; see *Oro Fino, supra,* at p. 880.) The *No Oil, Inc.,* court formulated this low threshold after noting that the EIR is the "heart" of CEQA and the principal method by which environmental data are brought to the attention of the responsible agency and the public, and that the Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (*No Oil, Inc., supra,* 13 Cal.3d at pp. 83-84.)

The low threshold of "reasonable possibility" in the CEQA/EIR context is inappropriate in the CESA candidacy determination arena. This is principally because the purpose of an EIR is to inform the public and responsible officials of the environmental consequences of their decisions before those decisions are made (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), whereas the CESA candidacy determination contemplates not only a study process but a substantive determination that a species is a candidate entitled to protection similar to that afforded endangered and threatened species. (§§ 2074.2, 2074.4-2075.5, 2080, 2084, 2085, 2096.) The determination of whether a species is a candidate under CESA contemplates a more formal, public, evidentiary and fact-finding process than does the determination of whether to prepare an EIR under CEQA.

The Commission and the interveners suggest a higher threshold for the "may be warranted" standard: the Commission would approve candidacy only if it is *reasonably probable* that endangered (or threatened) listing *will* occur. The genesis of this standard can be summarized as follows. Under CESA, a candidate species (as well as an endangered or a threatened species) is protected against being "taken." (§§ 2080, 2085.) Although the term "take" in CESA has not been defined by a California court in the context of habitat protection (see *Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th 1554; § 86), it is assumed by those proposing this standard that it will be defined broadly in this context in accord with its treatment by the federal courts. (See *Palila* v. *Hawaii Dept. of Land & Natural Resources* (1979) 471 F.Supp. 985, affd. 639 F.2d 495 (9th Cir. 1981); *Palila* v. *Hawaii Dept. of Land & Natural Resources* (D. Hawaii 1986) 649 F.Supp. 1070, affd. in part 852 F.2d 1106 (9th Cir. 1988);

*Mountain States Legal Foundation* v. *Hodel* (10th Cir. 1986) 799 F.2d 1423, 1427-1428; 16 U.S.C.A. §§ 1532(19), 1535(f); see also 50 C.F.R. § 17.3 (1992).) If the habitat of a candidate species is afforded this kind of protection, the argument goes, the development or use of affected lands would be severely restricted for up to one year while the candidate is studied for endangered or threatened listing. (See § 2074.6.) The argument concludes that since a determination favoring candidacy is akin to the grant of a preliminary injunction, the preliminary injunction standard should apply in making that determination.

It is unnecessary to consider how the word "take" in CESA is defined in terms of habitat protection, because the major problem with this "reasonably probable" standard is that its fundamental premise—that a determination favoring candidacy operates to preclude, during the candidate study process, all potential habitat development and land use—is erroneous. Under section 2084, "[t]he [C]ommission may authorize, subject to terms and conditions it prescribes, the taking of any candidate species." And under section 2096, "upon a request from a lead agency or a project proponent, the [D]epartment shall grant an informal consultation on any proposed project which may affect a candidate species. It is the intent of the Legislature to facilitate the resolution of potential conflicts between candidate species and proposed projects on the basis of information available at the time, and not to require the alteration of project processing schedules pending final determination of the status of any candidate species."[15] In addition to these specific measures, there are the legislative declarations that it is "the intent of the Legislature that reasonable and prudent alternatives shall be developed by the [D]epartment, together with the project proponent and the state lead agency, consistent with conserving the species, while at the same time maintaining the project purpose to the greatest extent possible" (§ 2053); and that "in the event specific economic, social, or other conditions make infeasible such alternatives, individual projects may be approved if appropriate mitigation and enhancement measures are provided" (§ 2054). In light of all these measures, the interveners exaggerate a candidate's ability to thwart the development process.

---

[15]The interveners cite some cryptic testimony in the administrative proceedings from the Director of the Department, suggesting that section 2084 may apply only to fish. The Director is mistaken. Section 2084 states in its entirety: "The [C]ommission may authorize, subject to terms and conditions it prescribes, the taking of any candidate species, or the taking of any fish by hook and line for sport that is listed as an endangered, threatened, or candidate species." The legislative history shows that section 2084, as originally proposed, did apply only to fish. However, the section was subsequently amended in the Senate to include the general provision covering "the taking of any candidate species." (Amends. to Assem. Bill No. 3309, amend. 16, as amended in Sen. June 25, 1984; Assem. Office of Research, Concurrence in Sen. Amend. (Assem. Bill No. 3309) August 27, 1984, p. 2.)

Furthermore, a standard of candidacy determination that turns on whether it is *"reasonably probable* that listing *will occur"* is at odds with the two-step listing process set forth in CESA and the Department's role in that process. In the first step of the process, the Department has 90 days to evaluate the petition and report a recommendation to the Commission. In this initial evaluation, the Department uses the same standard set forth in section 2074.2: does the petition provide sufficient information to indicate that the petitioned action "may be warranted?" (§ 2073.5.) After making this evaluation, the Department recommends either that the "petition should be rejected" or that it "should be accepted and considered." (§ 2073.5.) "If a petition is accepted by the [C]ommission for consideration" (§ 2074.4; see also § 2074.2(a)(2)), the second step of the listing process begins and the Department reviews the status of the species to advise the Commission regarding whether the petitioned action "is warranted." This Department review, however, contemplates up to 12 months of study, is based on the best scientific information available, and is conducted by an agency with statutorily recognized expertise in the area. (§ 2074.6; see §§ 1802, 2090-2096.) As the Commission itself acknowledges, this review contemplates "a year-long, detailed review." The two-step listing process described by this "may be warranted/is warranted" dichotomy strongly suggests a less stringent standard for "may be warranted" than *"reasonably probable* that listing *will occur."* The lower threshold contemplated by this dichotomy, however, is tempered by the fact that a "may be warranted" finding cloaks the candidate species with protection similar to that afforded endangered or threatened species. (See §§ 2080, 2085; but see §§ 2084, 2096.)

The standard suggested by the interveners and the Commission focuses on "reasonable probability" and "will." But this focus further demonstrates that the preliminary injunction analogy is inapt as applied to the CESA listing process. In discussing these terms in the preliminary injunction context, the court in *Hung* v. *Wang* (1992) 8 Cal.App.4th 908 [11 Cal.Rptr.2d 113] noted that the phrase "a reasonable probability" has been used by courts "to describe the conclusion that a particular outcome is more likely than not to occur. In determining whether a preliminary injunction should issue, for example, the trial court considers whether there is a *'reasonable probability* that plaintiff will be successful in the assertion of his rights.'" *(Id.* at p. 930, quoting *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889], italics added.) As the trial court in the present case perceptively observed, however, the Commission's duty under section 2074.2 to accept a petition for consideration if it provides sufficient information to indicate that the petitioned action "may be warranted" stands in sharp contrast to the Commission's obligation under section 2075.5 to

determine whether the petitioned action "is warranted." The standard of "reasonably probable that listing will occur," as applied to section 2074.2, muddles this "sharp contrast."

This highlights another factor that argues against the adoption of the proposed "reasonably probable" standard. That standard has a history of judicial interpretation and a settled meaning in the preliminary injunction context. (See *Hung* v. *Wang, supra,* 8 Cal.App.4th at p. 930.) It would have been easy for the Legislature to place this standard in section 2074.2. Instead, the Legislature chose the "may be warranted/is warranted" dichotomy.

■ A widely quoted passage on the issue of whether the word "may" connotes a possibility or a probability explains that " '[i]n one of its usable senses the verb "may" comprehends the idea of possibility, and, so used, becomes equivalent to the expression "might possibly;" it has been defined as to be possible. It may comprehend further the idea of probability, and also the thought of what is, with more or less certainty, to be expected. Whether it carries the thought of probability, or of possibility and not probability, often depends on the context. It has been said that it comprises all the possible rather than the *reasonably probable* consequences, but that it is not to be taken as including every conceivable possibility, and that it must be reasonably applied, having in mind the purpose in view.' 39 C.J. 1394." (*State* ex. rel. *English* v. *Ruback* (1938) 135 Neb. 335, 341 [281 N.W. 607, 610], italics added; see *Dean* v. *Kansas City, St.L. & C.R.Co.* (1906) 199 Mo. 386 [97 S.W. 910, 913]; *Reynolds* v. *St. Louis Transit Co.* (1905) 189 Mo. 408 [88 S.W. 50, 53]; see also *Scally* v. *W.T. Garratt & Co.* (1909) 11 Cal.App. 138, 153-154 [104 P. 325]; *No Oil, Inc., Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 83-84; *Sundstrom* v. *County of Mendocino, supra,* 202 Cal.App.3d at p. 309.)

This passage emphasizes the importance of context and purpose in interpreting statutory language. We have already discussed the context of section 2074.2 within the CESA listing process. ■ When statutory language is amenable to a range of meaning, as is the case with the section 2074.2 phrase "may be warranted," perhaps the factor of greatest significance in the interpretive equation is that of legislative purpose. (See *Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th at p. 1562.) We have seen that it is state policy under CESA to conserve, protect, restore and enhance endangered and threatened species, and their habitat, and that such species are of ecological, educational, historical, recreational, esthetic, economic and scientific value to the people of this state.

(§§ 2050-2068.) We have also seen that this policy is tempered with a requirement that it be imposed in a "reasonable" fashion. (*Ibid.*; see Somach, 20 Pacific L.J. at pp. 349-350.) Under CESA, an "endangered species" is in serious danger of becoming extinct (§ 2062); a "threatened species" is likely to become an endangered species in the foreseeable future absent protective intervention (§ 2067). By definition, then, these species are on the brink of survival. (See Field, *The Evolution of the Wildlife Taking Concept from its Beginning to its Culmination in the Endangered Species Act* (1984) 21 Houston L.Rev. 457, 502-503.) Against this backdrop, the legislative purpose of protecting and conserving endangered and threatened species would not be furthered by interpreting the section 2074.2 phrase "may be warranted" to mean a "reasonable probability that listing will occur."

Many of these points are illustrated in a Texas decision, *Europak, Inc.* v. *County of Hunt* (Tex.Civ.App. 1974) 507 S.W.2d 884, that construed an air pollution statute similar in structure to the CESA listing process. The *Europak* statute requires that any person planning to construct or modify a facility "which may emit air contaminants into the air" to obtain a construction permit from the air control board. If the board determines, after studying the matter, that the proposed construction "will comply" with air control standards, it is to issue the permit. (507 S.W.2d at pp. 886-887.)

The specific issue in *Europak* concerned the meaning of "may emit air contaminants into the air," which, the court noted, required interpretation of the auxiliary verb "may." (507 S.W.2d at p. 886.) The developer argued that "may" could not mean a mere possibility, but rather a " 'reasonable environmental probability that the [proposed] facility . . . *will* emit' " contaminants. (*Ibid.*, italics in original.)

The *Europak* court rejected the developer's argument. In the face of the statute's purpose "to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants," the court said it could not interpret the statute as "requiring a construction permit only when there is a 'reasonable probability' that air contaminants 'will' be emitted." (507 S.W.2d at p. 887.) The court added: "Neither do we interpret it as requiring such a permit whenever there is any conceivable possibility of such emission. Rather, we conclude from the context that a permit is required whenever there is a practical possibility so as to justify the Board in making an investigation . . . . The contrasting uses of 'may' and 'will' [in the statute] indicate a deliberate distinction between possibilities and probabilities." (*Ibid.*)

This reasoning is persuasive when viewed against the backdrop of the CESA listing process and the CESA statutory purpose of conserving and

protecting, in a reasonable way, endangered and threatened species and their habitat. Against that backdrop, the Commission first determines whether listing "may be warranted," and, after thorough study, whether listing "is warranted." Again, the "sharp contrast" noted by the trial court is apparent.

In sum, the "reasonable possibility" standard of the CEQA/EIR process sets too low a threshold for the "may be warranted" provision in section 2074.2. And the standard of "reasonably probable that listing will occur" sets too high a mark. But these two standards are helpful in delineating the spectrum of meaning and point to a standard located between them.

That point, we conclude, is appropriately characterized as a "substantial possibility that listing could occur." Like the court in *No Oil, Inc.*, which dealt with the phrase "reasonable possibility," we realize the imprecision of the phrase "substantial possibility." (13 Cal.3d at p. 83, fn. 16.) That is why we have defined it by relating it to other terms: something more than the CEQA/EIR standard of "reasonable possibility," which is the equivalent of only a fair argument (see *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 83, 85); something less than the preliminary injunction standard of "reasonably probable," which, in the CESA candidate-listing process, would deem it "more likely than not" that listing "will" occur. (See *Hung* v. *Wang, supra,* 8 Cal.App.4th at p. 930.) Absent these guideposts, the standard of "substantial possibility that listing could occur" is a characterization of little significance. Of course, this "substantial possibility" standard for the "may be warranted" language is applied in a quasi-adjudicatory format where the Commission takes evidence for and against listing, weighs it, and determines in its discretion what is essentially a question of fact.

We conclude the section 2074.2 phrase "petition provides sufficient information to indicate that the petitioned action may be warranted" means that amount of information, when considered in light of the Department's written report and the comments received, that would lead a reasonable person to conclude there is a substantial possibility the requested listing could occur (as the term "substantial possibility" has been comparatively defined herein).[16]

---

[16]We are aware of the principle that "[w]hile the ultimate interpretation of a statute is an exercise of the judicial power. . . , when an administrative agency is charged with enforcing a particular statute its interpretation of the statute will be accorded great respect by the courts 'and will be followed if not clearly erroneous.' " (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668-669 [150 Cal.Rptr. 250, 586 P.2d 564], citation omitted.) For several reasons, however, we do not think this principle of deference applies to

### 3. *Constitutional Concerns*

The intervener BIA claims that if section 2074.2 is interpreted as suggested by the trial court (i.e., the substantial evidence standard that BIA equates with the fair argument standard), CESA would violate, on three grounds, the due process clauses of both the state and federal constitutions.

Regarding the first ground, BIA argues that a substantial evidence standard is perfectly appropriate for judicial review, but as "applied to the *initial* adjudication decision of a tribunal or agency, a standard that provides that if the petitioner adduces substantial evidence it wins, no matter how compelling the contrary evidence, is the antithesis of due process. Such a process hardly satisfies the due process requirement that affected property owners have 'the opportunity to be heard "at a meaningful time and in a meaningful manner." ' " (Quoting *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 333 [47 L.Ed.2d 18, 32, 96 S.Ct. 893].) The short answer to this argument is that we have not adopted this kind of substantial evidence standard to be applied to the Commission's section 2074.2 determination. The process we envision for making that determination contemplates a taking of evidence for and against listing in a public quasi-adjudicatory setting, a weighing of that evidence, and a Commission discretion to determine essentially a question of fact based on that evidence. This process, in other words, contemplates a meaningful opportunity to present evidence contrary to the petition and a meaningful consideration of that evidence.

■ As for the second ground, BIA claims that a showing of the probable validity of the listing petition is constitutionally compelled, citing *Commissioner of Internal Revenue* v. *Shapiro* (1976) 424 U.S. 614 [47 L.Ed.2d 278, 96 S.Ct. 1062] and *Connecticut* v. *Doehr* (1991) 501 U.S. 1 [115 L.Ed.2d 1, 111 S.Ct. 2105]. Neither case is apposite.

In *Shapiro,* the Internal Revenue Service levied on the petitioner's bank accounts in a jeopardy tax assessment matter solely on the basis of a good-faith allegation that taxes were due. The court noted that permitting "the Government to seize and hold property on the mere good-faith allegation of an unpaid tax would raise serious constitutional problems in cases,

---

the Commission's support, in the trial court, of the "reasonably probable" standard. On appeal the Commission cites neither this principle nor this standard, but simply asks us to establish the proper evidentiary standard. The Commission's appellate position on this issue has been confined to arguing against the "fair argument" standard and the trial court's "substantial evidence" standard. It is clear the "reasonably probable" standard is not derived from long-standing administrative experience. And we have shown the error of the "reasonably probable" way. Under these circumstances, the principle of administrative deference does not apply.

such as this one, where it is asserted that seizure of assets pursuant to a jeopardy assessment is causing irreparable injury. This Court has recently and repeatedly held that, at least where irreparable injury may result from a deprivation of property pending final adjudication of the rights of the parties, the Due Process Clause requires that the party whose property is taken be given an opportunity for some kind of predeprivation or prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made." (424 U.S. at p. 629 [47 L.Ed.2d at p. 291].)

In *Doehr*, the court invalidated on due process grounds a state statute authorizing prejudgment attachment of real estate (in an assault case) based on an ex parte affidavit procedure characterized by the court as "one-sided, self-serving and conclusory." (501 U.S. at p. 14 [115 L.Ed.2d at p. 15].)

The contrast between the CESA listing process set forth in section 2074.2, as we have construed it, and these Kafka-like procedural deficiencies characterized in *Shapiro* and *Doehr* is readily apparent.

Finally, BIA argues on the basis of *Horn* v. *County of Ventura, supra,* 24 Cal.3d 605 that the trial court's substantial evidence standard does not satisfy the due process requirement that a property owner be provided "reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest." BIA does not appear to claim that the notice provisions set forth in the CESA candidacy determination process automatically violate due process, because BIA concedes the constitutionality of that process if the "reasonably probable" standard is applied.

To the extent that BIA's notice argument focuses on an opportunity to be heard, we have previously noted that the section 2074.2 process, as we have construed it, contemplates a meaningful opportunity to present evidence contrary to the petition and a meaningful consideration of that evidence by the Commission. (See *Horn* v. *County of Ventura, supra,* 24 Cal.3d at pp. 618-619; *Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 458 [121 Cal.Rptr. 585, 535 P.2d 713]; *Mathews* v. *Eldridge, supra,* 424 U.S. at p. 333 [47 L.Ed.2d at p. 32].)

To the extent that BIA's notice argument focuses on actual notice to individual property owners, *Horn* provides the guideposts to resolution. In that case the court discussed the practicality of providing individual notice regarding determinations of widespread import, noting that " '[w]here a rule of conduct applies to more than a few people it is impracticable that every

one should have a direct voice in its adoption.' " (24 Cal.3d at p. 613 quoting *Bi-Metallic Co.* v. *Colorado* (1915) 239 U.S. 441, 445 [60 L.Ed. 372, 375, 86 S.Ct. 141].) The court in Horn also distinguished between " 'adjudicatory' matters in which 'the government's action affecting an individual [is] determined by facts peculiar to the individual case' " and " 'legislative' decisions which involve the adoption of a 'broad, generally applicable rule of conduct on the basis of general public policy.' " (24 Cal.3d at p. 613.)

The Commission's section 2074.2 determination is a quasi-adjudicatory one encompassing both adjudicative and legislative elements. (See fn. 10, *ante*.) Although that determination, as interpreted herein, involves essentially a question of fact regarding whether there is a substantial possibility that the species at issue could be listed as endangered or threatened, the determination is not confined to a narrow set of litigants but may affect landowners across the state. Under these circumstances, there are practical problems with individual notice.

Under the CESA listing process, notice of the petition (requesting listing) is sent to interested persons and is published. (§ 2073.3.) The Department evaluates and reports on the petition, after which the Commission schedules a public hearing to consider it. (§ 2074, 2074.2.) Before this hearing, the Commission distributes the hearing agenda to interested persons and makes the petition available for review upon request. (§ 2074.) At the hearing, "the [C]ommission [must] consider the petition, the [D]epartment's written report, and comments received," and make published findings. (§ 2074.2.) If a petition is accepted for consideration, "all reasonable attempts [must] be made to notify affected and interested parties and to solicit data and comments on the petitioned action from as many persons as is practicable . . . Methods of notification may include, but are not limited to, correspondence, newspaper notices, and press releases, and notification shall include notice to owners of that land which may provide habitat essential to the continued existence of the species, unless the director determines that ownership is so widespread, fragmented, or complex as to make individual notice impractical." (§ 2074.4.) The "take" prohibition cannot apply to a candidate species until all of these procedural protections are completed. (§ 2085.) And a detrimentally affected party may seek relief from the "take" prohibition under section 2084.

We conclude that these notice and hearing requirements, when viewed in light of the section 2074.2 safeguards we have set forth and the *quasi*-adjudicatory nature of the section 2074.2 determination, satisfy the

due process principles noted in *Horn* of reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest.[17]

DISPOSITION

That portion of the judgment simply granting the issuance of a peremptory writ of mandate is affirmed. That portion of the judgment remanding the matter to the Commission and directing the Commission to make new findings in its section 2074.2 determination, using the section 2074.2 evidentiary standard as interpreted by the trial court, is reversed. The matter is remanded to the Commission to make new findings in its section 2074.2 determination using the section 2074.2 evidentiary standard set forth in this opinion and meeting the *Topanga* requirements. The Commission is directed to reopen these proceedings to allow an opportunity for the introduction of additional petition information, Department input, and comments. In making new findings in its section 2074.2 determination, the Commission shall consider this additional evidence, if there is any, as well as the existing record evidence. In all other respects, the judgment is affirmed. Each party shall pay its own costs on appeal.

Nicholson, J., and Raye, J., concurred.

---

[17]At oral argument, intervener BIA cited a recent California Supreme Court decision, *Traverso* v. *People* ex rel. *Department of Transportation* (1993) 6 Cal.4th 1152 [26 Cal.Rptr.2d 217, 864 P.2d 488]. *Traverso* summarized basic due process principles and applied them in the context of an owner of an allegedly illegal billboard along a highway. *Traverso* does not contain anything that causes us to change our views regarding the constitutionality of the section 2074.2 scheme as interpreted herein. In fact, *Traverso's* foundation is the venerable principles that all presumptions favor a statute's constitutionality and that statutes are to be construed, if their language permits, so as to render them constitutional.

In light of our interpretation of the evidentiary standard embodied in section 2074.2, we will remand this matter to the Commission to make new findings using that standard. Therefore, it is unnecessary for us to consider whether the Commission's original findings accord with the requirements specified in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506.